THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GREGORY BOWMAN, Defendant-Appellant.

Fifth District    No. 79-205

Opinion filed May 6, 1981.

John H. Reid and Gary D. Duncan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clyde Kuehn, State's Attorney, of Belleville (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Gregory Bowman, was convicted of kidnaping and unlawful restraint and was sentenced to an extended term of imprisonment of 14 years on the kidnaping offense. No judgment was entered on the unlawful restraint conviction.

Defendant raises the following issues on review: (1) whether defendant was denied his right to a speedy trial; (2) whether defendant was

denied effective assistance of counsel; (3) whether the State improperly bolstered the complaining witness' in-court identification of defendant through the use of prior consistent statements; (4) whether the State improperly introduced evidence of defendant's prior criminal history; and (5) whether defendant's sentence to an extended prison term violated defendant's right to equal protection under the law.

The pertinent aspects of the evidence adduced at trial are as follows. At approximately 10:30 on the evening of July 20, 1978, Jeanne Taylor was seated in the Helpee Selfee Laundromat in Belleville, Illinois, reading a book. A man approached her, requesting change for a dollar. He stood as close as two feet from her, and she had an unobstructed view of his face in a room illuminated by fluorescent lights. After she informed him that she had no change, the man remained standing in front of her for about a minute until she told him to keep trying the change machine. Finally, Ms. Taylor volunteered to make change for him. She made several attempts before she succeeded in getting the machine to accept his wrinkled dollar bill. After the machine made the change, the man grabbed her around the neck from behind, placed a knife against her throat and told her to be quiet or she would get hurt. The man forced her outside of the laundromat into an automobile and sped off. The fleeing vehicle was observed by several persons, including Mark Penseneau, who was able to identify the make, model, color, and approximate year of the vehicle. Ms. Taylor repeatedly struggled with the man in an effort to escape. He held her down and proceeded to drive through the streets of Belleville, apparently without a specific destination. At one point the man changed lanes and narrowly missed striking a motorcycle driven by Darl Lipps, who then gave chase. Eventually Lipps caught up with the vehicle when it was held up in traffic at a stop light. As Lipps approached the vehicle, a woman, who he later learned was Ms. Taylor, leaped out of the passenger side and ran. Sensing her to be in trouble, Lipps took the woman to a nearby bowling alley where she summoned the police. Lipps' description of the automobile was similar to Penseneau's. In addition, Lipps told the police that the license number of the vehicle he followed was AD 6752. Ms. Taylor viewed a photographic array on July 22, 1978, and, from a group of 10 photographs, selected defendant as the man who accosted her. Two days later she identified defendant at a lineup on the basis of his appearance and his high-pitched voice.

Defendant was taken into custody on July 22, 1978, and charged by criminal complaint with kidnaping and armed violence. The charges were amended by a bill of indictment to kidnaping and unlawful restraint. On September 22, 1978, defendant filed a motion for change of venue to a county other than St. Clair. On November 27, 1978, the motion was

granted and the trial was transferred to Perry County. Defendant appeared at trial but then entered a negotiated plea of guilty to count I of the indictment charging him with kidnaping. In exchange for the plea, the State agreed to dismiss count II, the unlawful-restraint charge, and agreed not to seek an extended-term sentence, which was available. During the course of the proceedings, the court, in commenting on the fact that defendant was already on parole for a prior conviction, referred to its understanding as to the policies of the parole board concerning revocation of defendant's parole. The trial court then accepted the plea and directed, without objection by defendant or his counsel, that the sentencing hearing and all other proceedings in the case be conducted in St. Clair County.

At the sentencing hearing on January 5, 1979, in St. Clair County, the trial court indicated that previously it had misunderstood the policy of the parole board with respect to parole revocation. The court stated that at the time the plea was accepted, it had been under the impression that the guilty plea would result in an automatic revocation of parole, requiring defendant to serve the 25 years remaining on his prior conviction. The court stated that it now understood that it was not a certainty that the board would require defendant to serve out the complete unexpired term on his prior conviction but instead would look to the sentence imposed for the current offense before determining the sentence to be imposed on the revocation. The trial court thereupon vacated defendant's guilty plea *sua sponte*, and a new trial day was set for January 16, 1979, in St. Clair County. The trial judge then recused himself from the case.

When the case was called for trial, the State announced ready, but defendant moved for another change of venue outside of St. Clair County. The motion was granted and trial commenced February 5, 1979, in Randolph County. However, prior to the start of trial, defendant petitioned for discharge, alleging a violation of his right to a speedy trial within 120 days as required by section 103—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a)). The motion was denied, which defendant now urges was error.

The record discloses that defendant was incarcerated from July 22, 1978, up to his trial date of February 5, 1979, a period of 198 days. Defendant concedes that 66 days of the delay in bringing the case to trial are attributable to him as a result of his initial motion for a change of venue; however, he urges that the remaining 132 days' delay must be charged against the State, thereby entitling him to discharge under the 120-day rule (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(a)). The State contends that the guilty plea waived any delay occasioned during the 39 days the plea was in effect between November 27, 1978, and January 5, 1979.

According to the State, this delay, when added to the 66 days admittedly attributable to defendant, would reduce the delay chargeable to the State to 93 days, a period well within the 120-day limitation.

■■ Although we are aware of no case addressing this specific issue, it is well settled that a guilty plea waives the right of an accused to have his conviction reversed for want of a speedy trial. (*People v. De Cola* (1959), 15 Ill. 2d 527, 155 N.E.2d 622; *People v. Ike* (1973), 10 Ill. App. 3d 933, 295 N.E.2d 250.) Left unanswered by these decisions, however, is the question of the consequence of the subsequent vacation of the plea which resulted in the waiver.

■■ We conclude that defendant's plea of guilty operated to toll the running of the 120-day rule during the period that elapsed between the entry of such plea and the order vacating it. Our primary consideration for such determination of this issue is best illustrated by the dictum of the court in *People v. Hickman* (1971), 3 Ill. App. 3d 919, 930, 280 N.E.2d 787, 794, *rev'd on other grounds* (1973), 56 Ill. 2d 175, 306 N.E.2d 32, in which the court stated:

> "This court is of the opinion that where a defendant has plead guilty he waives the 120 day rule and cannot avail himself of it by changing his plea to not guilty a day or two before the expiration of the 120 days."

We agree.

We therefore conclude that defendant's waiver of the benefits of the 120-day rule, referred to in *Hickman*, is operative so long as defendant's plea of guilty remains in effect as his plea to the charge. Were we to hold otherwise, the rationale of the cases involving waiver of the 120-day rule by a defendant who has pleaded guilty would be circumvented on all occasions in which, after the expiration of the 120-day period, a plea of guilty entered before the expiration of 120 days was withdrawn or vacated or the proceedings surrounding its entry were reversed on appeal. Consequently, in the instant case, any delay in defendant's prosecution was waived by the entry of his plea of guilty on November 27, 1978, and such waiver would continue until such plea was vacated on January 5, 1979, thereby tolling the 120-day rule during the period between the entry of his plea of guilty and its vacation. Trial was held 31 days later on February 5, 1979. Assuming that the 31 days were completely attributable to the State, there was full compliance with the provisions of section 103—5(a).

Next, defendant contends that he was denied effective assistance of counsel where defense counsel's law partner was a former assistant State's Attorney who participated in the preliminary stages of the prosecution of this case.

The State informed the trial court at defendant's arraignment that

defense counsel's law partner, Stephen Rice, was a former assistant State's Attorney who took part in the early stages of the prosecution. Stephen Rice was present when defendant was initially interviewed by the police, and he personally drafted a warrant for the search of defendant's automobile. Stephen Rice is currently a partner in the law firm of Rice & Durso; and defense counsel, Robert Rice, is also a partner in the firm.

■■ Under the sixth amendment, defendant is guaranteed the right to counsel. Further, an accused is entitled to the undivided loyalty of his attorney. (*Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457.) This right uniformly is protected, and convictions have been overturned where court-appointed counsel had participated only to a minor extent in the early phases of the prosecution prior to representing the defendant. (*People v. Kester* (1977), 66 Ill. 2d 162, 361 N.E.2d 569; *People v. Wyatt* (1977), 47 Ill. App. 3d 582, 362 N.E.2d 122.) *Kester* and *Wyatt* would preclude Stephen Rice from representing defendant despite his limited role in the case as an assistant State's Attorney. Further, where one member of a law firm is disqualified from representing a defendant due to a conflict of interest, all members of the firm are disqualified. Nevertheless, a defendant may waive his right to be defended by counsel free from a conflict of interest, thereby permitting representation by counsel otherwise deemed disqualified, if the waiver is knowingly and intelligently made. *People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157.

■■ In the instant case, when the trial court was confronted with the possibility of a conflict arising out of Stephen Rice's relationship to the case, the following colloquy occurred:

"THE COURT: Mr. Robert Rice, what do you think about this?

MR. RICE: The data that my new partner was privy to was that which would be supplied to us anyway. To my knowledge he is not privy to any confidence that would be of prejudice to the State.

THE COURT: The further question would be, though, whether the—in the event that—I am not saying there would be, but should, looking ahead, should there be a conviction, I wouldn't want them to have that—to raise that point.

MR. RICE: Well, your Honor, as I kidded the prosecutor it could be a matter that the State might feel prejudiced by, and I have explained this fully with my client. It is hard to—difficult to conceive of any prejudice to the defendant.

THE COURT: I can't of any prejudice that would arrise [*sic*], but that is his decision.

MR. RICE: He understands that, your Honor, and is willing to waive that.

THE COURT: You waive that, do you?

DEFENDANT BOWMAN: Yes, I do.

THE COURT: That settles that."

We conclude that this colloquy is dispositive of this issue because it establishes that defendant knowingly and intelligently waived any conflict of interest attendant to the representation afforded him by Robert Rice.

Defendant next contends that the trial court erred in not granting a mistrial where the prosecution bolstered the complaining witness' identification testimony with testimony of prior consistent statements.

Detective Sergeant James Rokita of the Belleville Police Department testified for the State that he conducted a lineup at the St. Clair County jail for viewing by Jeanne Taylor. According to Rokita, each person in the lineup wore a jumpsuit upon which a number had been affixed, and Ms. Taylor was asked to write down the number of any person she recognized as her abductor. The following colloquy ensued during Sergeant Rokita's testimony:

"Q. And in regards to that after the lineup had been conducted, did Jeanne Taylor write down a number?

A. Yes, she did.

Q. What number was that?

A. She wrote number six on the slip of paper.

Q. After writing that number down, what, if anything, did you say?

A. I asked her if she was positive this was the subject that abducted her.

Mr. Rice: I object to this, Your Honor, calls for hearsay.

THE COURT: Sustained.

Mr. Sturgeon: Your Honor, I do have case law which I would submit to you. If I could have one minute, Your Honor. If I may approach the Bench.

(Whereupon a discussion was had at the Bench between Court and counsel and off the record.)

Q. [Mr. Sturgeon] What was her response when you asked her that question, are you sure, Officer?

A. Definitely.

Mr. Rice: I object to this, Your Honor.

THE COURT: Overruled.

Q. [Mr. Sturgeon] And what was her response?

A. Definitely."

The State proceeded to establish through Rokita that Ms. Taylor had also indicated that she recognized defendant by his voice which she described as high-pitched and effeminate. Defendant objected to this latter testimony and was overruled once more.

Special Agent Gerald F. Johnson of the Illinois Division of Investigation testified for the State that he had conducted a photographic identification procedure in which Ms. Taylor identified her abductor as being the individual depicted in a photograph of defendant. Johnson stated that defendant's photograph was selected from a group of 10 photographs and explained the selection process in more detail as follows:

"Q. And then what happened, sir?

A. She then took the photographs from me, placed them in front of her and went through them one at a time.

Q. Did she look at number one?

A. Yes, she did.

Q. Was there any response to that?

Mr. Rice: We object to that.

THE COURT: Overruled.

Q. Did she look at number one?

A. Yes.

Q. Did she make any response in regards to number one?

A. No.

Q. Did she look at number two?

A. Yes, she did.

Q. Did she make any response in regards to number two?

A. No.

Mr. Rice: I'd like the record to note our continuing objection. Hearsay.

THE COURT: Noted.

Q. Did she make any response to number two?

A. No, she did not.

Q. Did she look at number three?

A. Yes, she did.

Q. Did she have a response, if any, to number three?

A. Yes, she says, that's him.

Q. And then what happened?

A. Then I asked her, are you sure.

Mr. Rice: We object to this, your Honor.

THE COURT: Overruled.

A. She stated that she was. I asked her to then view the rest of the photographs in order and she did.

Q. And then what happened, sir?

A. Following the photographic lineup?

Q. After looking at all ten, did you ask her again?

A. Yes. She said she was positive it was number three.

Q. And in regards to that, who is pictured in number three, sir?

A. The defendant.

Q. By the defendant, would you describe what he's wearing in the courtroom today?

A. The gentleman sitting at the table with counsel with the dark blue leisure suit."

Having made numerous objections to the foregoing testimony of Rokita and Johnson, defendant subsequently moved for a mistrial urging, *inter alia*, that it was error to allow such testimony where it was hearsay and where its purpose was to bolster Ms. Taylor's in-court identification of defendant. The motion for a mistrial was denied, and defendant assigns such denial as one of the grounds for this appeal.

■■ ■ Testimony by a police officer that a witness previously identified the accused is hearsay and cannot be used to bolster the witness' in-court identification of an accused. (*People v. Harrison* (1962), 25 Ill. 2d 407, 185 N.E.2d 244; *People v. Townsend* (1969), 111 Ill. App. 2d 316, 250 N.E.2d 169.) Consequently, the admission of the testimony of Rokita and Johnson, as it pertained to Ms. Taylor's identification of defendant at the lineup and during the photographic array, was erroneous. Nevertheless, whether the introduction of such testimony is reversible error depends upon the strength of the in-court identification and the presence of corroborating circumstances. *People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133.

■■ Based on Ms. Taylor's unequivocal in-court identification and the corroborating testimony of Mark Penseneau and Darl Lipps concerning the identification of the vehicle used in the crime, we find the error to be harmless. Jeanne Taylor testified that she was able to view her abductor from a distance of two feet when he requested change for a dollar. The laundromat was illuminated by fluorescent lights, which enabled her to get a clear, unhurried look at the man's face. Since she was not assaulted until after the change was obtained, her ability to identify him was not impeded by fear, anxiety, or other emotional distractions. In short, the conditions in the laundromat furnished a very conducive basis for making a positive identification. Ms. Taylor made such a positive identification in court when she unequivocally identified defendant as her attacker. Moreover, her identification was not grounded upon defendant's appearance alone. She testified that her abductor had a high-pitched voice. She recognized this voice when defendant was asked to say a few words at the lineup. Further, Ms. Taylor's identification was corroborated by evidence connecting defendant to the vehicle used in the abduction. She testified that People's Exhibit No. 8, a photograph depicting the interior of defendant's automobile, was similar to the interior of the vehicle she was forced into. In addition, she testified that the location of the radio and the

door handle recesses in her abductor's automobile was identical to that in the exhibit; and she also described the vehicle as being blue in color.

Further corroboration is supplied by the testimony of Mark Penseneau, an auto body repairman, who stated that he heard screams at the Helpee Selfee on the night of the abduction and observed a blue 1976 or 1977 Grand Prix leave the laundromat at a high rate of speed. Penseneau was certain of the model and the approximate year because of a distinctive front grill common only to a Grand Prix of that vintage. He testified that the vehicle he saw was similar to the vehicle shown in People's Exhibit No. 6, which is a photograph of the exterior of defendant's automobile. Darl Lipps also corroborated Ms. Taylor's identification by testifying that a blue Grand Prix narrowly missed striking him as it changed lanes. He related that he gave chase and eventually caught up with the driver at a stop light. Lipps memorized the license number he thought was on the vehicle he was chasing and gave the number to the police. This license number was AD 6752. However, it was established at trial that this particular license number is assigned to a 1967 white Ford registered to Genevieve Ladas, who testified that no one but her had access to her Ford and that it was parked in her driveway during the night of July 20, 1978. The record indicates that Detective James Westcott, on a hunch, investigated license number AD 8762 since the number somewhat resembles the digits in AD 6752. Westcott traced license number AD 8762 to a Grand Prix owned by defendant.

The evidence demonstrates that Jeanne Taylor had an excellent opportunity for making a positive identification. Moreover, the identification was corroborated by proof that the vehicle used in the abduction was owned and operated by defendant. Although Officers Rokita and Johnson erroneously were permitted to bolster Ms. Taylor's in-court identification, the prejudicial effect to defendant was at most minimal and the error was harmless.

Defendant additionally urges that the trial court erred in denying his motion for mistrial, because the State and one of its witnesses made references to the fact that defendant's photograph had been obtained from the Illinois Department of Investigation, thereby implying to the jury that defendant had a prior criminal history. The first of the statements defendant now complains of, made by the State in opening argument, is as follows:

> "Our evidence will further show that after, after the look-alike picture with the similar characteristics of the person who had abducted her had been taken, Detective James Westcott went around, and he went to a person by the name of Spindler, the Spindler family. He showed the picture and after showing the

similar picture, he inquired about someone else. And, in response to that, they made a request of the Illinois Department of Investigation. The Illinois Department of Investigation went and obtained ten photographs, ten photographs, and showed to Jeanne Taylor. In the early morning hours of July 22nd. Out of those ten pictures, Jeanne Taylor picked one as the person she was positive as having abducted her, the defendant, Gregory Bowman, was that person."

During the State's case in chief, Detective Westcott explained the origin of the photograph of defendant in the following colloquy:

"Q. What did you do then, sir?

A. We went back to the police department and Sgt. Rokita called for a file on Mr. Bowman to obtain a photograph of Mr. Bowman.

A. And in fact was a photograph brought to the police station that evening?

A. Yes, sir, it was.

Q. All right. And in fact that photograph was that used in the course of a photographic identification, sir?

A. Yes, sir."

■■ Evidence associating an accused with other crimes is generally inadmissible, but an exception occurs where the evidence goes to the issue of identification. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506; *People v. Lewis* (1964), 30 Ill. 2d 617, 198 N.E.2d 812.) In *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529, defendant objected to testimony relating to the investigatory procedures utilized by the police which led to his arrest. On direct examination a police officer gave this description in *Longstreet*:

" 'Q. Okay, what did you do next?

A. I went to the alpha file.

Q. Before we go into that, briefly describe to the ladies and gentlemen on the Jury what the alpha files are.

A. It is an alphabetical listing of any persons who has [*sic*] had contact with the police department.' " (23 Ill. App. 3d 874, 880, 320 N.E.2d 529, 533.)

The reviewing court held that defendant suffered no prejudice from this explanation because the officer's testimony did not refer to the commission of any prior unrelated acts by the defendant. Following the testimony concerning the "alpha" file, the officer went on to explain that a group of photographs, including one of defendant, shown to a witness for purposes of identification, were of " 'people that my unit has arrested for robberies or unlawful use of weapons, carrying a gun in the street.' " (23 Ill. App. 3d 874, 880-81, 320 N.E.2d 529, 533.) The appellate court concluded that the officer's brief mention of the source of the photographs

was directly related to the issue of identification and, therefore, fell within the rule enunciated in *Lewis*.

■■ In the instant case there is no testimony directly linking defendant to the commission of any prior criminal offenses. Whatever prejudice there might be from the opening statement and Westcott's testimony must be the result of an inference. It is important to note that the suggested inference was made in the context of identifying defendant through the use of photographs. Thus, under *Lewis* the statements would not be prejudicial error. Additionally, on the basis of the record before us, we are of the opinion that there is far less prejudice to defendant here than in *Longstreet*.

For the foregoing reasons, we conclude that the trial court did not err in denying defendant's motion for a mistrial.

Finally, defendant contends that he received an extended term of imprisonment in violation of his constitutional right to equal protection under the laws.

Defendant was sentenced to a term of imprisonment for 14 years for kidnaping under the extended-term statute. The defendant points out that the application of the extended-term provision in the instant case is based on defendant's prior conviction for a felony in the State of Illinois within the preceding 10 years. He urges that such an application is unconstitutional in that it discriminates against those defendants whose prior convictions occurred in the State of Illinois because persons with convictions in other States within the 10-year period are not subject to its terms.

Under the prevailing case law, anyone attacking the validity of a statute bears a heavy burden, since statutes are always presumed to be constitutional. (*People v. Adduci* (1952), 412 Ill. 621, 108 N.E.2d 1.) The Illinois Supreme Court has described the burden of one who would strike down a statute as proof beyond a reasonable doubt. (*People v. Brady* (1916), 272 Ill. 401, 112 N.E. 126.) Classifications, such as that used in the extended term statute, must be upheld if any state of facts may be reasonably conceived which would justify the classification. (*People v. McCabe* (1971), 49 Ill. 2d 338, 275 N.E.2d 407.) The possibility that a statute does not best cover every set of facts does not render it invalid. The validity of legislation does not depend on complete comprehensiveness, nor does the constitution require that a statute conform to an ideal pattern of orderliness. *Donoho v. O'Connell's, Inc.* (1960), 18 Ill. 2d 432, 164 N.E.2d 52.

The provision of section 5—5—3.2 of the Unified Code of Corrections subjects to a possible extended term of imprisonment one who has been convicted in Illinois within 10 years of the "same or greater class felony." Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(1).

■■ Because of the distinct and comprehensive scheme of classification of

felonies in Illinois (see Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1) through (7)), the extended term of imprisonment provision is susceptible of uniform application. However, in other States, offenses are either classified differently or not at all, and offenses with similar or identical names often consist of different elements. Thus, it would be impossible to ascertain whether a particular felony in another State was of the same or greater class as the felony for which a defendant is being sentenced in Illinois. As a consequence, it would be impossible to uniformly apply the extended-term provision to defendants with prior convictions in other States. Moreover, the State of Illinois has no direct interest in deterring the commission of crimes in other States; therefore, the distinction serves a valid purpose by excluding prior convictions in such other States.

We conclude that the limitation of the extended-term provision to persons with prior convictions in Illinois is warranted by the necessity of uniformity of application as well as by the interest of the State of Illinois in deterring crime within its own borders; therefore, its constitutionality is manifest and must be upheld.

For the reasons stated above, we affirm defendant's conviction and sentence.

Affirmed.

JONES and HARRISON, JJ., concur.