THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v*
DANIEL KLEBA, Defendant-Appellant.

First District (5th Division)   No. 81—0375

Opinion filed November 12, 1982.

Julius Lucius Echeles, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Shapiro, and Barbara A. Levin, of counsel), for appellee.

JUSTICE WILSON delivered the opinion of the court:

Following a bench trial, defendant was convicted of attempted deviate sexual assault, attempted rape, aggravated kidnaping and robbery (Ill. Rev. Stat. 1981, ch. 38, pars. 8—4, 10—2 and 18—1), for which the trial court sentenced defendant to concurrent extended terms of 15 years, 14 years, 20 years and 14 years, respectively. On appeal, defendant contends that: (1) the evidence is insufficient on all charges to sustain a finding of guilty; (2) the trial court erred when it denied a motion for new trial founded upon a new witness; (3) defendant was denied his sixth amendment right to counsel when forced to proceed with counsel not of his own choosing; (4) defendant was subjected to double jeopardy when, after defendant waived his right to a jury trial, the court sought to impanel a jury; (5) the indictment count for aggravated kidnaping fails to state a cause of action; (6) the extended-term provisions of section 5—5—3.2(b)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(1)) are unconstitutional; (7) imposition of separate sentences for attempted rape, attempted deviate sexual assault, robbery and aggravated kidnaping is improper; and (8) the court violated Illinois statutory law when, over defendant's objection, it ordered the refund of defendant's bail deposit to his attorney of record. For the reasons that follow we affirm in part and reverse in part.

The pertinent facts disclose that in August 1979, defendant was indicted for attempted rape, attempted deviate sexual assault, unlawful restraint,[1] robbery and aggravated kidnaping. (Ill. Rev. Stat. 1981, ch. 38, pars. 8—4, 8—4, 10—3, 18—1 and 10—2, respectively.) Defendant retained Samuel Wexler as his private counsel and, by agreement of the parties, trial was set for December 12, 1979. Between Decem-

---

[1]The charge for unlawful restraint merged with the attempted rape conviction as a lesser-included offense. (*People v. McCann* (1979), 76 Ill. App. 3d 184, 187, 394 N.E.2d 1055.)

ber 12, 1979, and October 27, 1980, trial was continued seven times. The record reveals that six of the seven continuances were at defendant's request and five of those six were requested because of Wexler's unavailability due to illness. Because of Wexler's continued illness, in June 1980 Bernard Brody filed his appearance as co-counsel for defendant.

On October 27, 1980, Brody appeared without Wexler and moved that the trial be continued once again due to Wexler's illness. Brody further informed the court that a continuance was necessary because defendant insisted that Wexler, not Brody, represent him at trial. The State objected to defendant's motion, citing the numerous continuances already granted defendant and the resulting inordinate delay. At this point in the proceedings, defendant attempted to formally discharge Brody as his counsel. The court, however, disallowed the discharge and accused defendant of indulging in dilatory tactics. Thereafter, the court ordered commencement of the jury selection, at which time defendant stated that he chose to waive his right to a jury trial. The court recognized defendant's right to waive trial by jury, but indicated that it would proceed, nonetheless, to impanel a jury for advisory purposes only. The court explained that it would not be required to follow the jury's verdict, rather, it would merely consider the jury's verdict in making the final determination. Upon defendant's vehement objection to use of the jury in an advisory capacity, the court recessed the proceeding to review relevant case law. Subsequently, citing the complexity of the advisory jury question, the court granted defendant's prior motion for a continuance and set the trial date for December 3, 1980. In setting the new date, the court advised defendant that if he was not satisfied with his present counsel, he should retain substitute counsel and be prepared to commence with the trial on the next date.

On December 3, Brody appeared on defendant's behalf and the trial commenced. The first witness to testify was Dr. Christopher Rose, who resided in a second-floor apartment at the corner of Wellington and Seminary in Chicago. Dr. Rose stated that on August 3, 1979, approximately 12:45 a.m., he heard what appeared to be a muffled female scream coming from below his open window which faced Seminary. He immediately looked out and saw a human form lying face down between two parked cars and a bicycle lying nearby. Upon running outside, he saw that a male was actually lying on top of another person. At that time he could not distinguish the sex of the person on the bottom and he could not see the face of the person on top.

Dr. Rose then testified that while he was upstairs calling the po-

lice, he watched the man get up and lead the other person, who he could then discern to be a female, south on Seminary and then west down the alley between Oakdale and Wellington. The man had his right arm around the woman and was carrying what appeared to be a metal object in his left hand, held near the base of the woman's throat. When the police arrived, Dr. Rose directed them toward the alley.

Complainant was next to testify and stated that on August 3, 1979, approximately 12:45 a.m., she arrived home from work and was standing in front of her apartment building in the 2900 block of Seminary looking for her keys when she was suddenly punched on the side of the face and knocked face down on the ground between two parked cars. Her assailant then jumped on top of her and threatened to kill her if she moved or screamed. After several minutes, the assailant put one arm around complainant's neck and the other arm around her back, yanked her to her feet, and forced her toward the alley which was a couple of feet away. Complainant then stated that while they were walking down Seminary toward the alley, she saw a woman with two dogs, but was unable to scream for help because of the armlock the assailant had around her throat. When they entered the alley, the assailant forced her toward a dimly lit gangway, then through a gate leading into a dark yard area where the assailant held her against the side of a garage, ordered her to pull down her jeans and underwear, bend over and clasp her ankles. While she was in that position, he began fondling her vagina with one hand while he kept the other hand pressed down on her neck. Complainant further testified that she heard the assailant start to pull down a zipper and she also heard "something rustle like, material like or something." Complainant also stated that at one point assailant momentarily stopped fondling her and moved his hand down her left arm to loosen her watch. When the watch fell to the ground, he picked it up and put it into his pocket. The assailant then yanked her head up and started pushing her toward a gate between two gangways that led to Oakdale, ordering her to jump over the gate or he would kill her. When a spotlight from a car going west on Oakdale flashed down the gangway, assailant pushed complainant to the ground and fled north toward Wellington. At no time did complainant see her assailant's face. She did, however, see the back of his hand, and, thus, could positively identify her assailant as a male Caucasian. In addition, complainant testified that her attacker had liquor on his breath and appeared to be a couple of inches taller than she.

Next, Investigator Clarence Oleskiewicz of the Chicago police de-

partment testified as to the following. On the morning of August 3, 1979, Oleskiewicz, a plainclothes policeman, was on duty with his partner, Investigator Poli. About 1 a.m. on that date, Oleskiewicz and Poli, in response to a simulcast, headed toward the 1100 block of Wellington. Upon arriving at the scene of the attack, Dr. Rose directed the officers to the alley between Oakdale and Wellington. The officers then drove west down the alley, looking through open gates for a Caucasian male and female. They did not see anyone. They then drove east down Wellington to Seminary, turned right on Seminary to Oakdale and proceeded west on Oakdale, shining their car spotlight down the gangways as they drove along until Oleskiewicz finally saw a Caucasian male apparently choking a Caucasian female in the alley behind 1140 W. Oakdale. He then began chasing the male on foot, through the yards, north toward Wellington. Shortly thereafter, another officer arrived and undertook a lateral pursuit. Finally, in the yard area of 1107 W. Wellington, the assailant ran into a locked gate and was tackled by the pursuing officers. Oleskiewicz testified that he never lost sight of the assailant from the time he first saw him to the actual arrest. At trial, Oleskiewicz identified defendant as the assailant.

Oleskiewicz further testified that when he searched defendant, he found a woman's watch in defendant's front pocket, which he then marked with his initials and inventoried at the police station. At trial, complainant identified the watch as hers and both arresting officers identified it as the watch found on defendant at the time of arrest.

Next to testify was Officer Bruce Stefan of the Chicago police department who stated that on August 3, 1979, approximately 1 a.m., he and his partner, Willard Streff, monitored a simulcast after which they proceeded to the 1100 block of W. Wellington. While driving west in the alley between Oakdale and Wellington, Stefan saw a Caucasian male running across the alley with another Caucasian male running about 10 feet behind the first. At trial, Stefan identified defendant as the first male and Oleskiewicz as the man chasing him. Stefan undertook a lateral pursuit of defendant on foot through the adjacent gangway. During the chase, defendant jumped the fence into the yard Stefan was in and proceeded northbound through that building's gangway toward the front yard where he ran into the front gate, bounced off it, turned, and was wrestled to the ground by the pursuing officers.

Finally, defendant testified that on the evening of August 2, 1979, approximately 9:30 p.m., after completing calls on potential remodeling customers, he stopped in a restaurant at Clark/Broadway/Diversey

in Chicago. While in the restaurant, he met a young woman named "Candy" who invited him to her apartment in the 1100 block of W. Wellington. Defendant testified that he had one beer at Candy's apartment, engaged in sexual intercourse, then left at approximately 1 a.m. He then stated that while he was walking west on the south side of Wellington toward his car, a man ran out of the gangway, almost knocking him down. When he turned to see where the man was going, two other people jumped him from behind, knocked him to the ground and started punching him until he lost consciousness.

Defendant claims that when he regained consciousness, he was on a table in a hospital emergency room and had no recollection as to how he got there. Lastly, defendant denied all charges, denied that the watch was found on him, and claimed that the arresting officers had not read him his rights.

For purposes of impeachment, the State then moved to introduce defendant's record of prior convictions for rape and robbery into evidence. The court weighed the probative value of the evidence against the unfair prejudice resulting to defendant and concluded that, because the crime of robbery involved dishonesty and reflected on a person's likelihood to tell the truth, the record of robbery convictions would be admissible. However, because the rape convictions did not prove or disprove defendant's likelihood to tell the truth, the record of rape convictions was not admissible.

Immediately following closing arguments, the court rendered its decision and, thereafter, granted the State's motion to revoke defendant's bond. Post-trial motions were then set, and a presentence investigation was ordered. On December 23, 1980, defendant's motion to substitute counsel was granted. Shortly thereafter, defendant filed motions for new trial and arrest of judgment which were denied. Defendant's timely appeal followed.

OPINION

I

Without admitting that the evidence proves beyond a reasonable doubt that he was the assailant, defendant contends that the convictions for attempted rape, attempted deviate sexual assault, robbery and aggravated kidnaping must be reversed because the State failed to present sufficient evidence at trial to establish the essential elements of each offense.

A

*Attempted Rape/Presumptions*

First, defendant argues that the State failed to prove beyond a reasonable doubt that he had the specific intent to rape complainant, or that he committed an act which constituted a substantial step toward raping her.

Pursuant to the Criminal Code of 1961, the offense of attempt is committed when "with intent to commit a specific offense *** [a person] does any act which constitutes a substantial step toward the commission of that offense." (Ill. Rev. Stat. 1981, ch. 38, par. 8—4(a).) In the pending case, the specific offense charged is rape, defined by the Criminal Code as occurring when "[a] male person of the age of 14 years and upwards *** has sexual intercourse with a female, not his wife, by force and against her will ***." Ill. Rev. Stat. 1981, ch. 38, par. 11—1(a).

Defendant relies on *People v. Cieslak* (1925), 319 Ill. 221, 149 N.E. 815, for his contention that proof of only an intent to commit a sexual assault is not sufficient to support a conviction for attempted rape. We find *Cieslak* factually inapposite to the case at bar, and, thus, unpersuasive. In *Cieslak*, defendant and complainant, an unmarried male and female, were visiting the apartment of friends. When the friends left to go on an errand, defendant and complainant remained at the apartment. When the friends returned, they found complainant sitting on the stair landing, her face badly bruised. Defendant had left. Complainant alleged that defendant threw her on the bed and beat her when she refused to have sexual intercourse with him. Defendant, on the other hand, claimed that complainant encouraged his advances and they fought only when she grabbed money from his pocket in payment for her sexual services. At trial, defendant attempted to introduce evidence of complainant's unchaste character. In disallowing the testimony, the court made some highly prejudicial remarks which were grounds for reversal on appeal. The *Cieslak* court never addressed the issue of whether an intent to commit a sexual assault was sufficient to support a conviction for attempted rape.

As an alternative argument, defendant relies on the recent Illinois Supreme Court decision, *People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151, as support for its position that "one cannot presume from a given fact to another fact essential to sustain a conviction unless the presumed fact is more likely than not to flow from the proved fact." Defendant asserts that application of *Housby* to the pending case requires reversal of the attempted rape conviction because proof

beyond a reasonable doubt of defendant's specific intent to have vaginal intercourse does not flow from the proved fact that an assault was committed.

It is our opinion that *Housby* has no application whatsoever to the facts of the instant case. The *Housby* court unequivocally confines its analysis of presumptions to those situations in which a defendant in exclusive possession of stolen property with no reasonable explanation for having the property is presumed to be guilty of burglary.[2] The court held that the unexplained possession of recently stolen property may support an inference of guilt of the crime of burglary only if (1) there is a rational connection between the possession and the participation in the burglary; (2) the guilt of burglary is more likely than not to flow from the possession of the burglary proceeds; and (3) there is corroborating evidence of guilt. Defendant's statement that *"Housby* is not limited to the presumption there considered, i.e., presumption of burglary from recent possession" is clearly not supported by *Housby* or its progeny.[3] Furthermore, application of defendant's interpretation of *Housby* to the case at bar would obfuscate the statutory definition of "attempt" and be tantamount to judicial usurpation of the legislature's amendatory functions.

In its argument, the State relies on *People v. Almond* (1975), 31 Ill. App. 3d 374, 333 N.E.2d 236, as dispositive of the attempted rape charge. The *Almond* court held that the specific intent needed to convict the defendant of attempted rape could be inferred from circumstances of the assault itself. In *Almond,* the defendant attacked the victim from behind on a public street and knocked her to the ground. He then put one arm tightly around her neck and attempted to drag her into a nearby alley, threatening to kill her. At one point, the defendant held the victim against a car and tried to unbutton her clothing. He was interrupted by squealing tires and fled. In upholding the defendant's conviction for attempted rape, the *Almond* court stated:

> "We feel that the defendant's choking the prosecutrix and pulling her in the direction of an alley, coupled with his attempt

___

[2]In *Housby,* defendant contended that the jury instructions regarding the offense of burglary mandated the jury to draw an inference which deprived him of due process and compelled a verdict of guilty. The jury instructions were as follows: "If you find that the defendant had exclusive possession of recently stolen property, and there was no reasonable explanation of his possession, you may infer that the defendant obtained possession of the property by burglary."

[3]Application of the *Housby* holding has been confined to those cases involving burglary or retail theft.

to disrobe her constituted a substantial step toward the commission of the crime of rape. Moreover, a trial court could infer from these circumstances, in spite of the fact the assailant never vocalized his intent, that he intended to rape the prosecutrix. Consequently, we hold that the acts of defendant in this case were in furtherance of the substantive crime of rape and constituted a substantial step toward the commission of the offense from which the trier of fact could infer the specific intent needed to convict the defendant of the offense charged." 31 Ill. App. 3d 374, 377-78.

■ In the case at bar, defendant knocked complainant to the ground, repeatedly threatened to kill her, held her neck in an immobilizing armlock and dragged her into an alley where he forcefully held her next to a garage, ordered her to remove her jeans and underwear, then bend over and clasp her ankles. He then began fondling her vagina. After sexually assaulting her for several minutes, defendant ordered complainant to jump a fence into yet a more secluded area. It was at this point that the police interceded and defendant fled. Based on the striking similarities between the pending case and *Almond,* we hold that the acts of defendant in this case were in furtherance of the substantive crime of rape and constituted a substantial step toward the commission of the offense from which the trial court could infer the specific intent needed to convict the defendant of attempted rape.

B

*Attempted Deviate Sexual Assault*

Defendant further contends that the evidence fails to establish the offense of attempted deviate sexual assault. The statutory definition of attempt is given in section "A" herein. The relevant specific offense of deviate sexual assault is defined by the Criminal Code, in pertinent part, as occurring when "[a]ny person of the age of 14 years and upwards *** by force or threat of force, compels any other person to perform or submit to any act of deviate sexual conduct ***."[4] Ill. Rev. Stat. 1981, ch. 38, par. 11—3(a).

Defendant argues that even though complainant was bent over with her pants pulled down and her buttocks exposed, exposure alone

---

[4]The criminal offense of deviate sexual conduct is defined as: " 'Deviate sexual conduct,' for the purpose of this Article, means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another." Ill. Rev. Stat. 1981, ch. 38, par. 11—2.

is not sufficient to prove beyond a reasonable doubt that the defendant had specific intent to have anal intercourse. Testimony by both complainant and defendant revealed that throughout the time complainant was bent over clasping her ankles, defendant was standing in front of her. At no time did defendant stand behind the complainant when she was in the bent-over position.

■ In response, the State argues that "it would have been difficult for defendant to come any closer to a deviate sexual assault without commission of the offense itself, which would have occurred once his penis touched her anus." It is our opinion that had defendant at some point in the fondling been standing behind the complainant, the substantial step element of attempted deviate sexual assault would have been met. It is clear from the record, however, that no such position was taken by defendant. Therefore, we hold that no such position was taken by defendant. Therefore, we hold that there was insufficient evidence to prove the offense of attempted deviate sexual assault beyond a reasonable doubt and reverse the trial court's conviction of that offense.

## C

*Robbery*

Defendant next contends that the State failed to prove the essential "force" element of the offense of robbery and, thus, the conviction should be reversed.

Robbery is the taking of property "from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1981, ch. 38, par. 18—1(a).) Specific intent is not an element of robbery. (*People v. Smith* (1980), 78 Ill. 2d 298, 306, 399 N.E.2d 1289.) Furthermore, the requirement of force or threat of force is satisfied if the fear of the alleged victim was of such nature as in reason and common experience is likely to induce a person to part with his property for the sake of his person. However, the cause which gives rise to the fear must precede or be contemporaneous with the taking. *People v. Whitley* (1974), 18 Ill. App. 3d 995, 999, 311 N.E.2d 282.

Defendant maintains that complainant's watch accidentally fell off her arm, thus, the necessary force or threat of force was missing. Defendant further asserts that the force involved in the attempted rape cannot be imputed to the taking of the victim's property. As support for his arguments, defendant relies on *People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013, *People v. Pack* (1976), 34 Ill. App.

3d 894, 341 N.E.2d 4, and *People v. Romo* (1980), 85 Ill. App. 3d 886, 407 N.E.2d 661. We find these cases to be clearly distinguishable from the case at bar.

In *King*, the defendant raped the victim in one room, then took her purse from another. In *Pack*, defendant choked the victim on a bed until he thought she was dead, then took money from her purse which was lying on a nearby chair. In both *King* and *Pack* the use of force on the victim had clearly ceased before the taking of the property. In fact, in neither case was the victim even aware that her property was being taken. In *Romo*, the defendant, posing as a detective, grabbed the victim's wallet out of his hand while he was looking for his license. The court held that the "grabbing" of the wallet from the victim's hands did not demonstrate sufficient force to meet the requirements of the offense of robbery.

■ In the instant case, unlike in *King, Pack* and *Romo*, force was used on complainant both prior to and contemporaneous with the taking of her watch. When defendant first encountered complainant, he knocked her to the ground and repeatedly threatened her life. Defendant then yanked complainant up off the ground and held her so tightly that she could not move her head. Once defendant maneuvered complainant to a dark area, he forced her to pull down her jeans and underwear, bend over and clasp her ankles. While she was in this position, defendant continued pressing down on her neck with one hand and fondling her vagina with another. At one point, he stopped fondling her momentarily and moved his hand down her arm apparently to loosen her watch. When the watch fell off, he picked it up and put it in his pocket. Throughout the time it took to run his hand down her arm and pick up the watch, defendant never stopped pressing down on complainant's neck. There is no doubt that the physical force used on complainant and the concomitant verbal threats to her life caused her to part with possession of her watch against her will. For these reasons, we hold that all elements of the offense of robbery have been proven beyond a reasonable doubt and the trial court's conviction is affirmed.

D

*Aggravated Kidnaping*

Defendant next contends that there was insufficient evidence to prove the secret confinement element of the offense of aggravated kidnaping.

The Criminal Code defines "kidnaping," in pertinent part, as oc-

curring "when a person knowingly: (1) [a]nd secretly confines another against his will, or (2) [b]y force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will ***." (Ill. Rev. Stat. 1981, ch. 38, par. 10—1(a)(1), (2).) Of further relevance, the Code defines "aggravated kidnaping," in pertinent part, as occurring when a kidnaper as defined in section 10—1(a) "[i]nflicts great bodily harm or commits another felony upon his victim ***." Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)(3).

The secret confinement element of kidnaping may be shown by proof of the secrecy of either the confinement or place of confinement. (*People v. Mulcahey* (1978), 72 Ill. 2d 282, 381 N.E.2d 254.) In the instant case, defendant mistakenly relies on *Mulcahey* and *People v. Bishop* (1953), 1 Ill. 2d 60, 114 N.E.2d 566, as support for his argument that pushing the complainant down a dark alley to a secluded yard area next to a garage does not demonstrate his intent to secretly confine the complainant.

In *Mulcahey*, the victim was taped to a chair in her own home. The court held that "[t]he victim in this case was 'secretly confined' as effectively in her own home as if defendant had asported her to some remote isolated place of confinement." (*People v. Mulcahey* (1978), 72 Ill. 2d 282, 285.) In *Bishop*, the victim was confined to a moving automobile driven by defendant. The *Bishop* court held that such confinement was secret in that "[c]ommon experience has shown that a victim and his kidnaper so situated can be most difficult to locate." *People v. Bishop* (1953), 1 Ill. 2d 60, 64.

■ Applying the rationale of both *Mulcahey* and *Bishop* to the pending case clearly reveals that the complainant was secretly confined within the meaning of the statute. Investigator Oleskiewicz testified that when he drove west in the alley between Oakdale and Wellington, with searchlights on, purposely looking for suspicious activity, he did not see anyone. The difficulty which the officers had in locating defendant and complainant vividly illustrates the secrecy of the place of confinement. In fact, complainant and defendant were not seen until they moved away from the garage. In his brief, defendant further argues that because "there were other people around," *i.e.*, the woman walking her dogs, the place of confinement was not secret. However, the record reveals that complainant saw the woman while being pushed down the street toward the alley. The woman was not visible while the defendant and complainant were next to the garage, the actual place of secret confinement. For these reasons, we hold that sufficient evidence was presented at trial to prove the secret confinement element of the offense of kidnaping. Furthermore, because

the trial court's conviction of robbery has been affirmed, the felony element of aggravated kidnaping has been satisfied and the trial court's conviction of aggravated kidnaping is affirmed.

E

*Identification*

Defendant next maintains that complainant's inability to identify him as her assailant coupled with the incredible testimony offered by the arresting officers created a reasonable doubt as to his guilt.

Defendant relies on *People v. Bartley* (1962), 25 Ill. 2d 175, 182 N.E.2d 726, and *People v. White* (1978), 56 Ill. App. 3d 757, 372 N.E.2d 691, as support for his contention that complainant's failure to identify him is grounds for reversal. We find *Bartley* and *White* to be distinguishable from the case at bar and, thus, of no persuasive value. In *Bartley*, the court reversed defendant's murder conviction on the grounds that the sole eyewitness to the crime saw the killer at close range and yet could not identify the defendant, and the only other State's evidence was circumstantial. In *White*, the court reversed defendant's robbery conviction on the ground that the witness who saw the perpetrators full-face in a lighted hotel lobby was doubtful of the identification and there was no corroborating evidence to connect defendant with the crime.

In the pending case, complainant never had the opportunity to see her assailant. She was punched in the face, knocked face down to the ground with defendant lying on top of her. When defendant yanked her up, he was standing slightly behind her and had her in an armlock position that would not allow her to move her head. In fact, the only time defendant faced complainant was when she was bent over, clasping her ankles. The complainant did testify, however, that her assailant was Caucasian, had liquor on his breath and was slightly taller than she. Defendant fit this description exactly.

The rule is well established that in a bench trial, the credibility of witnesses and the weight to be given to their testimony are matters for the trial judge to determine and will not be disturbed on appeal unless it is based upon evidence which is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Beason* (1975), 32 Ill. App. 3d 305, 336 N.E.2d 511.) Furthermore, the testimony of a single witness is sufficient to sustain a conviction if positive and credible even if it is contradicted by the accused. *People v. White* (1978), 56 Ill. App. 3d 757, 372 N.E.2d 691.

Contrary to defendant's contention, we find nothing incredible in

the testimony of the arresting officers. Defendant claims that the officers, while in pursuit of the "real" assailant, ran out of the gangway onto the sidewalk where defendant was walking, grabbed defendant, and beat him until he was unconscious. As a result of the beating, defendant maintains that the officers had to arrest defendant as the assailant because, otherwise, they would have no explanation for their unprovoked assault on him. We concur with the trial court that the explanation of pursuit and arrest given by the pursuing officers was far more credible than that given by defendant. Investigator Oleskiewicz testified that defendant received his injuries when he ran into a locked gate, and was subsequently tackled to the ground by the officers. Officer Stefan corroborated this explanation. In addition, both officers testified that complainant's watch was found on defendant at the time of the arrest. Defendant, however, offered no plausible explanation as to why the watch was found on him. Instead, he simply denied that it was on him at the time of the arrest. For these reasons, we hold that the weight of the evidence identifying defendant as the assailant was positive, credible and sufficient to establish defendant's guilt beyond a reasonable doubt.

## II

Next, defendant argues that the trial court erred in denying his motion for a new trial when he presented an affidavit from the woman he had visited on the night of the attack which established an alibi.

As set forth by this court, the standard for review of a motion for new trial on the ground of newly discovered evidence states that the new evidence must be of such conclusive character that it will probably change the result on retrial. (*People v. Carpenter* (1979), 74 Ill. App. 3d 770, 774, 393 N.E.2d 50.) Furthermore, the new evidence must be material to the issue, not merely cumulative, and it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. (*People v. Starr* (1976), 37 Ill. App. 3d 495, 501, 346 N.E.2d 410, quoting *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.) Motions for a new trial on the basis of newly discovered evidence are not looked upon favorably by the courts and will always be subjected to the closest scrutiny. The question is largely discretionary on the part of the trial court, and the exercise of its discretion will not be disturbed on appeal except in the case of manifest abuse. *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 774, 393 N.E.2d 50.

Defendant asserts that Candy's testimony would have corrobo-

rated his version of the facts and thereby dispel the disbelief engendered by the State's assertions that defendant's story was ridiculous. We find this argument unpersuasive. Candy's testimony, as indicated by the affidavit included in the record, seems to be more accurately characterized as impeachment testimony rather than testimony which contradicts by showing facts. It is well-established that newly discovered evidence which serves to discredit, contradict and impeach a witness does not afford a basis for the granting of a new trial. (*People v. Holtzman* (1953), 1 Ill. 2d 562, 116 N.E.2d 338.) Even if we interpreted the testimony as showing facts, however, the testimony would not have had sufficient probative force or weight to produce a verdict of not guilty. For example, had defendant left Candy's apartment just 10 minutes earlier, he would have had ample time to have committed the crimes for which he was convicted. Furthermore, Candy did not see the actual apprehension of defendant, nor did she see the alleged fleeing assailant. Thus, she could have done no more than to testify that she spent several hours with defendant, a fact which is not in issue.

Defendant further argues that trial counsel's (Brody's) failure to timely produce Candy at trial cannot be a basis for denying a new trial due to lack of diligence when Brody's failure was the result of his ineffective assistance as counsel. This argument is totally without merit. In effect, defendant is attempting to use the allegation of inadequate representation as an affirmative defense for not having exercised due diligence in trying to locate Candy. While this is creative lawyering, it is inappropriate.

In *People v. Talley* (1981), 97 Ill. App. 3d 439, 443, 422 N.E.2d 1084, the court set forth the standard of effective assistance of counsel, private or court-appointed, and stated that the pertinent inquiry is whether the attorney was actually incompetent, and caused such substantial prejudice to defendant that the outcome was probably changed. In the case at bar, defendant has not established breach of this standard. In fact, the record reveals that Brody put forth a solid, aggressive defense.

Furthermore, the record reveals that defendant informed his counsel, Sam Wexler, about Candy well before trial began. In June 1980, Brody filed his appearance as co-counsel with Wexler. Throughout the period of trial continuances, defendant was cognizant of Wexler's unavailability due to illness and yet never made certain that Brody, as co-counsel, knew about Candy's potential value as a witness. The fact that defendant failed to cooperate with Brody cannot now be used to reverse the trial court's convictions. It would be a mockery of

the judicial system, indeed, if a defendant could refuse to cooperate with his counsel and then, on appeal, claim counsel's lack of preparation as a ground for reversal. (*People v. Elder* (1979), 73 Ill. App. 3d 192, 391 N.E.2d 403.) Under these circumstances, we conclude that defendant has not met his burden of rebutting the presumption that the verdict is correct or that the trial court displayed a manifest abuse of discretion in denying the motion for a new trial.

## III

Defendant next contends that he was denied his sixth amendment right to counsel when the trial court forced him to proceed with counsel not of his own choosing.

A defendant's right to be assisted by counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, sec. 8) includes the right to be represented by counsel of his choice. (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 196, 384 N.E.2d 767.) However, this right may not be utilized to frustrate the administration of justice or to otherwise embarrass the effective prosecution of crimes. (*People v. Gornick* (1982), 107 Ill. App. 3d 505, 437 N.E.2d 892.) At what point a defendant's right to select counsel unreasonably interferes with the orderly process of judicial administration necessarily depends upon the particular facts and circumstances surrounding each case and is a matter which lies within the sound judicial discretion of the trial court. *People v. Spurlark* (1978), 67 Ill. App. 3d 186, 197, 384 N.E.2d 767.

In the pending case, counsel for defendant, Sam Wexler, filed his appearance in August 1979. Trial date was originally set for December 12, 1979. After numerous continuances requested by defendant, Bernard Brody filed his appearance as co-counsel for defendant in June 1980. The record reveals that at the time Brody filed his appearance, Wexler was ill and, in fact, questioned his own future availability as defendant's counsel. Defendant was aware of Brody's co-counsel status and verbally agreed to it when questioned by the trial court. After several more continuances, trial was set for October 27, 1980. On that date, Brody asked for yet another continuance stating that defendant did not want to proceed without Wexler who remained hospitalized. The State objected vigorously, reminding the court that Wexler had been ill for over a year. At that point, defendant attempted to discharge Brody as his counsel. The court, however, would not allow it, and admonished defendant for his use of dilatory tactics, stating:

> "You know Mr. Brody is a very competent and very trained
> lawyer around this court, and I believe you chose him to come

in as co-counsel for the trial, and I was advised at the time even by Mr. Wexler when he appeared here, and Mr. Brody was going to be the trial counsel, and it was with that understanding that I gave the continuance on the date that I did on April 30th, 1980, and I believe that they're just going nowhere.

\* \* \*

Now, one of the conditions of your being out on bail is that you cooperate with the Court in getting this case to trial, and it's been out quite a lengthy time here."

The trial court then ordered commencement of jury selection, at which time defendant waived his right to a jury trial. Because of questions raised by defendant's waiver, trial was continued to December 3, 1980. In granting the continuance, the court stated:

"And unless this defendant has some other attorney from now until that time who can get prepared and be ready in the event Mr. Wexler cannot—it's your choice. You certainly can bring in any lawyer you want to try the case, but he's got from now until that time to be prepared in case Mr. Wexler cannot be prepared."

The record reveals no attempt by defendant to retain new counsel, and on December 3, 1980, Brody appeared on defendant's behalf.

In support of its position that defendant was not deprived of counsel of his choice, the State relies on *People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767. While we find *Spurlark* to be highly persuasive, we find the recent Illinois Supreme Court case, *People v. Williams* (1982), 92 Ill. 2d 109, to be dispositive of the issue. In *Williams*, as in the pending case, it took over a year and a half for the case to proceed from complaint stage to trial, during which time defendant was free on bail. At least a year of that delay was directly attributable to defendant's continuous changing of attorneys. Trial was finally set for December 3, 1979, then continued twice more on defendant's motions that he had still not retained counsel. On January 16, 1980, defendant again appeared in court without counsel and asked for yet another continuance. The court, however, denied the motion and demanded that the trial proceed with defendant appearing *pro se*. On appeal, the appellate court held that the defendant's right to counsel had been violated. The Illinois Supreme Court reversed, stating:

"Discretion was not abused here. Judicial patience need not be infinite. The trial court could quite reasonably conclude that the defendant was seeking to postpone trial.

\* \* \*

[W]here a defendant who is financially able to engage counsel has been instructed to do so \*\*\* and does not show reasonable cause why he was unable to secure representation, the court may treat such a failure as a waiver of the right to counsel and require him to proceed with the hearing." 92 Ill. 2d 109, 116-18.

■ In *Williams*, the deprivation of counsel was clearly more egregious than in the pending case, yet the supreme court found there was no abuse of judicial discretion. Here, defendant was represented by competent, experienced counsel of his choice. Moreover, defendant had been adequately and timely advised by the trial court to find substitute counsel if he so desired. We find his subsequent failure to do so constitutes an explicit acceptance of Brody as his counsel of choice. Therefore, we hold that the trial court could have reasonably found that the purpose of defendant's request to discharge Brody on the day of trial was to obtain further delay and thereby hamper the orderly process of law.

## IV

Next, defendant argues that he was unconstitutionally twice put in jeopardy when, after he waived trial by jury, the court commenced the process of jury selection, then later dismissed the prospective jurors and proceeded with a bench trial.

■ It is axiomatic that the protections against double jeopardy are triggered only after an individual has been subjected to the hazards of trial and possible conviction. In criminal jury trials, jeopardy is said to attach when a jury is impaneled and sworn. In a criminal bench trial, the point of attachment is when the first witness is sworn and the court begins to hear evidence. (*People v. Shields* (1979), 76 Ill. 2d 543, 546-47, 394 N.E.2d 1161, *cert. denied* (1980), 445 U.S. 917, 63 L. Ed. 2d 602, 100 S. Ct. 1279; Ill. Rev. Stat. 1981, ch. 38, par. 3—4(a)(3).) In the pending case, the parties concur that the prospective jurors were dismissed before a jury was impaneled. Defendant, however, asserts that where a defendant is exposed to "the emotional trauma of jury selection," without good cause, the principles of double jeopardy apply. This argument has no basis in law or fact. In the instant case, at the time the prospective jurors were dismissed, defendant had not yet been placed in jeopardy of conviction as defined by case law. Therefore, we find his double jeopardy claim to be without merit.

## V

In addition, defendant maintains that count 5 of the indictment charging him with aggravated kidnaping (Ill. Rev. Stat. 1981, ch. 38, par. 10—2) was insufficient and, thus, invalid, because it failed to explain with specificity the asportation element of the offense.

The Illinois Criminal Code states that, in order for a criminal charge to be effective, it must (1) be in writing, (2) name the offense, (3) cite the pertinent statutory provision, (4) set forth the nature and elements of the offense, (5) state the date and county of the offense, (6) state the name of accused or, if the name is unknown, describe the accused in such a manner that he can be identified with reasonable certainty. (Ill. Rev. Stat. 1981, ch. 38, par. 111—3(a)(1), (2), (3), (4), (5).) Furthermore, Illinois case law requires that an indictment be specific enough to inform the accused of the offense with which he is charged, to enable the accused to prepare a defense, and to permit him to plead the judgment as a bar to future proceedings for the offense. *People v. Sims* (1982), 108 Ill. App. 3d 648, 439 N.E.2d 518.

In the pending case, the indictment by which defendant was charged with aggravated kidnaping alleged that:

> "*** on August 3, 1979, at and within [Cook] County Daniel Kleba otherwise called Daniel J. Kleba committed the offense of aggravated kidnaping in that he, knowingly by force and threat of imminent force, carried *** [complainant] from one place to the other with the intent to secretly confine *** [complainant] against her will and committed a felony, to wit: robbery, upon her, in violation of Chapter 38, Section 10—2, of the Illinois Revised Statute 1977, as amended ***."

We believe that count 5 was specific enough to inform defendant of the offense with which he was charged, enabled him to prepare a defense, and will allow him to plead the judgment as a bar to future proceedings for the offense. For these reasons, plus the fact that defendant failed to show that the omission complained of prejudiced him in any way, we find that the trial court did not err in denying the motion to dismiss count 5 of the indictment.

## VI

Next, defendant contends that the extended-term provision of section 5—5—3.2(b)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(1)) creates a disparity based upon an irrational classification, *i.e.*, situs of the prior conviction, and, therefore, violates the equal protection and due process clauses of the fourteenth amendment to the United States Constitution and article I,

section 2 of the Illinois Constitution. In support of his contention, defendant attempts to compare the habitual criminal provisions (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1) with the extended-term provision and argues that when the legislature recently amended the habitual criminal provisions to include jurisdictions other than Illinois, it indirectly admitted that all statutes with situs distinctions were irrational.

■ In response, the State relies on *People v. Bowman* (1981), 96 Ill. App. 3d 136, 420 N.E.2d 1132, as support for its position that there is a rational basis for the situs distinctions, *i.e.*, uniformity of application of the law; thus, the extended-term provision is constitutional. We agree with the State and find *Bowman* dispositive of the issue. In upholding the constitutionality of the extended-term provision, the *Bowman* court stated:

> "Because of the distinct and comprehensive scheme of classification of felonies in Illinois [citation], the extended term of imprisonment provision is susceptible of uniform application. However, in other States, offenses are either classified differently or not at all, and offenses with similar or identical names often consist of different elements. Thus, it would be impossible to ascertain whether a particular felony in another State was of the same or greater class as the felony for which a defendant is being sentenced in Illinois. As a consequence, it would be impossible to uniformly apply the extended-term provision to defendants with prior convictions in other States. Moreover, the State of Illinois has no direct interest in deterring the commission of crimes in other States; therefore, the distinction serves a valid purpose by excluding prior convictions in such other States." 96 Ill. App. 3d 136, 147-48.

In accord with *Bowman*, we conclude that the limitation of the extended-term provision to persons with prior convictions in Ilinois is constitutionally justified by the need for uniformity of application. Therefore, the extended-term sentences imposed by the trial court are affirmed.

## VII

Defendant next argues that imposition of separate sentences for attempted rape, attempted deviate sexual assault, robbery and aggravated kidnaping was improper on the ground that any act which was the basis for any one of the convictions was also the act upon which the other convictions were founded.

The rule regarding multiple convictions and concurrent sentences

is set forth in *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, as follows:

> "Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered."

■■ In the pending case, we find that each of defendant's convictions which we have affirmed was based on a separate physical act,[5] thereby satisfying the *King* test. Therefore, we uphold the concurrent sentences imposed by the trial court for those convictions we have previously affirmed.

## VIII

Finally, defendant contends that because the court's authority to refund defendant's bail deposit is confined to that situation where defendant specifically requests the court to do so, the court violated section 110—7(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 110—7(f)) when, over defendant's objection, the court ordered the refund of defendant's bail deposit to his attorney of record, Bernard Brody.

In response, the State asserts that defendant had executed a valid assignment of his bail to Wexler and Brody before trial, therefore, when Brody fulfilled his contractual obligation to defendant by representing him at trial, the court properly refunded defendant's bail to Brody after trial.

■■ It is well-established under Illinois law that when a valid assignment is effected, the assignee acquires all of the interest of the assignor in the property that is transferred and stands in the shoes of the assignor. Moreover, it is common practice for a criminal defendant to assign his bail bond deposit, less costs, to his attorney to assure the attorney's collection of fees. (*People v. Wurster* (1981), 97 Ill. App. 3d 104, 106, 422 N.E.2d 650.) In the instant case, defendant signed a bail

---

[5] As discussed in section IB of this opinion, defendant's conviction for attempted deviate sexual assault is reversed by this court, and, thus, is not relevant to this issue.

bond slip which operated to assign the bail refund to his attorneys, Wexler and Brody, in exchange for their representation of him at trial. The record indicates that Wexler was ill throughout the trial and that Brody alone fulfilled his contractual obligation to defendant. For this court to allow defendant to repudiate his legal assignment of the bail bond would be to sanction a blatant attempt on defendant's part to breach a fully executed contract with Brody. (See *People v. Horton* (1973), 9 Ill. App. 3d 97, 100, 291 N.E.2d 844.) The fact that defendant is not pleased with the outcome of the trial is not sufficient ground for revocation of the valid assignment. Furthermore, the first paragraph of section 110—7(f) states that upon performance of the bail bond, the balance shall be returned to the defendant "unless that court orders otherwise." The subsequent paragraph of that same section authorizes the court, in its own discretion, to use the bail deposit to pay defendant's attorney of record if defendant so requests. We interpret the second paragraph as one of explanation, not one of limitation. For these reasons, we hold that the trial court's decision to refund the bail bond to Brody was a reasonable exercise of sound discretion and, therefore, affirm the refund.

For the foregoing reasons, the judgment of the circuit court of Cook County as to defendant's conviction on the charges of attempted rape, robbery and aggravated kidnaping is affirmed and the judgment as to the conviction for the offense of attempted deviate sexual assault is reversed.

Affirmed in part; reversed in part.

LORENZ and MEJDA, JJ., concur.