**UNITED STATES of America ex rel. Daniel J. KLEBA, Petitioner-Appellant,**

v.

**Kenneth McGINNIS, Respondent-Appellee.**

No. 85–1024.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 1986.

Decided July 21, 1986.

Cindy Reich Masover, Chicago, Ill., for petitioner-appellant.

Kenneth A. Fedinets, Office of Ill. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

The petitioner, Daniel J. Kleba, filed a petition for a writ of habeas corpus challenging his convictions in the Circuit Court of Cook County, Illinois on the grounds that he was denied his Sixth Amendment right to counsel. Kleba alleged, *inter alia,* that he was not represented by the counsel of his choice and that he received ineffective assistance of counsel. Kleba appeals from the decision of the United States District Court for the Northern District of Illinois denying his petition. We affirm.

## I

Daniel J. Kleba was indicted in August of 1979 for attempted rape, attempted deviate sexual assault, unlawful restraint, robbery and aggravated kidnaping. The evidence at Kleba's trial in the Circuit Court of Cook County revealed that at approximately 12:45 a.m. on August 3, 1979, one Jane Doe [1] was attacked on the street in front of her apartment on the near north side of Chicago as she was returning from work. According to Doe, her assailant hit her in the face, pushed her face down to the ground between two parked cars, and jumped on top of her. He subsequently pulled her to her feet, and with one arm around her neck the assailant forced her to walk toward the adjacent alley. Once in the alley, he led her into a dark gangway and through a gate to a dark yard area. In the yard, the assailant pushed Doe against a garage and began to sexually assault her. According to Doe, at some point during this incident, the assailant removed Doe's watch from her wrist, the watch fell to the ground, and the assailant picked it up. Throughout the assault and sexual attack, Doe was unable to see the assailant's face

---

1. Jane Doe is a pseudonym.

but she did note that he was a male Caucasian when she observed his hand reaching to the ground to pick up her watch. She also noted and stated that he had alcohol on his breath.

One of Doe's neighbors testified that while in his apartment on the morning of August 3, 1979, he heard a scream at approximately 12:45 a.m. and went out to the street where he observed a male lying on top of another person between two parked cars. The neighbor returned to his apartment and called the police to report the incident. While he was on the telephone with the police, he observed the male with his arm around the victim's neck leading her (he could then identify the victim as a female) towards the adjacent, lighted alley.

Investigator Clarence Oleskiewicz, a plain clothes officer with the Chicago Police Department, testified that he arrived at the crime scene in front of Doe's apartment around 1:00 a.m. in response to a police radiocast. Doe's neighbor directed Oleskiewicz and his partner to the illuminated alley where he had observed the assailant leading Doe. The officers drove through the illuminated alley looking for Doe and her assailant. Seeing no one, they proceeded down a street running parallel to the lighted alley in question, as Oleskiewicz shined the car's spotlight down gangways as they drove. Oleskiewicz eventually observed "a man choking a woman" in the gangway of one of the buildings. When the spotlight shone on the pair, the assailant pushed the victim to the ground and fled northward toward the lighted alley. Oleskiewicz exited his vehicle and pursued the assailant on foot northward across the illuminated alley and the headlights of an approaching vehicle, into yards on the northside of the alley. The assailant turned west, cutting across at least one

yard, finally running into a locked gate where he was apprehended by Oleskiewicz and "other police officers" who subsequently arrived on the scene and joined in the pursuit. According to Oleskiewicz, the defendant fled approximately seventy-five yards before he caught him and no more than one minute elapsed from the time the chase began until the defendant was apprehended. Oleskiewicz testified that he never lost sight of the assailant from the time the spotlight first flashed upon him as he stood choking Doe until he and his fellow officer apprehended and arrested the assailant, Daniel Kleba, the defendant. The transcript of this testimony reads, in part: "Q. You had lost sight of him though, didn't you on some occasion? A. No, sir, I never lost sight of him. Q. You never lost sight of him at all? A. No sir, I never did." Oleskiewicz testified that following the arrest, he searched Kleba and found a woman's watch in his pocket which Doe identified at trial as her watch.[2]

Bruce Stefan, an officer who joined the pursuit and assisted in the detention and arrest of Kleba, testified that he and his partner were driving through the lighted alley at the scene of the attack in response to a police radiocast. As they were driving through the illuminated alley, Stefan observed a Caucasian male, subsequently identified as Kleba, dart northward across the alley in the path of the headlight beam of his car. Kleba was being chased by Oleskiewicz who was about ten feet behind. Stefan undertook a lateral pursuit of the assailant, and entered a yard adjacent to the yard where he had observed Oleskiewicz in pursuit of Kleba. According to Stefan, Kleba jumped a fence into the yard where Stefan was waiting, ran into a locked gate, and was wrestled to the ground by Stefan and Investigator Oleskiewicz. Stefan related that he saw Olesk-

---

**2.** Contrary to the dissent's assertion that in pursuing Kleba Oleskiewicz "had to make at least two turns," the record recites but one turn during the minute-long, seventy-five yard chase. Kleba fled north along a gangway that was clearly illuminated by the spotlight of Officer Oleskiewicz' vehicle on Oakdale Avenue. (Tr. 224). Kleba then was observed running due

north across the lighted alley (Tr. 212, 278), and was then illumined by the headlights of Officer Stefan's approaching car. (Tr. 269–270). Kleba next turned west, only to be apprehended approximately one block north and one house-length west of where Officer Oleskiewicz' pursuit began. (Tr. 278).

iewicz search Kleba, discover and recover a woman's watch from Kleba's pocket.[3]

The defendant Kleba offered a different version of the events of the morning of August 3, 1979. He testified that after making calls on prospective customers for his remodeling business, he stopped for dinner at approximately 9:30 p.m. on the evening of August 2, 1979 in a restaurant a few blocks from the scene of the attack on Doe. At the restaurant, he met a young woman who introduced herself as "Candy" and she invited him to her apartment. They drove to her apartment in his car, located in the same block where the sexual attack occurred. According to Kleba, they arrived at the apartment around 11:00 p.m., he consumed one beer, they engaged in sexual intercourse, and he left the apartment at approximately 1:00 a.m. He stated that as he was walking along the sidewalk to return to his car, a man ran out of a gangway between two buildings, almost knocking him down. Two people then knocked him to the ground from behind and began beating Kleba until he lost consciousness. Kleba claimed that he regained consciousness in a hospital emergency room, with no recollection of how he had gotten there. Kleba denied that he committed the crimes charged and further denied that the watch was found in this pocket.

The defendant retained Samuel Wexler as his counsel and the parties agreed to a trial date of December 12, 1979. Between December 12, 1979 and October 27, 1980, the trial was continued on six occasions, and five of the continuances were attributable to Wexler's ill health. In June of 1980 Bernard Brody filed an appearance to serve as co-counsel for Kleba.

On October 27, 1980 Brody appeared without Wexler, and moved for another continuance because of Wexler's illness, and informed the court that Kleba demanded that Wexler and not he (Brody) repre-

sent him at trial. The trial court denied the motion for a continuance and the following exchange took place:

"MR. BRODY: ... I've had a talk with Mr. Kleba, and Mr. Kleba wishes to address the court, with your permission, Judge.

DEFENDANT KLEBA: Your honor, I have discharged Mr. Brody as co-counsel in this case, and I would like for Mr. Sam Wexler to be my lawyer.

THE COURT: Well, of course you remember I said at the time Mr. Brody had filed his appearance that, you know, whoever you got to get into this case as additional counsel certainly is your pleasure, but it would be set for trial and he would be—whatever, he would be made to go ahead with the trial.

You said you wanted Mr. Brody.

MR. BRODY: I think, Judge, he meant that I was to be co-counsel with Wexler. He wanted both. I think that's what he meant.

Am I right, Mr. Kleba?

DEFENDANT KLEBA: Right."

The trial court denied a motion to withdraw Brody as counsel, and continued the discussion with Brody and Kleba:

"THE COURT: ... Now, one of the conditions of your being out on bail is that you cooperate with the Court in getting this case to trial, and it's been out quite a lengthy time here. It's been put to trial for March 24.

\*       \*       \*       \*       \*       \*

... [A]t this point, I'm beginning to find and to feel that they're just delaying tactics—using delaying tactics here....

MR. BRODY: Judge, he's discharged me.

THE COURT: I'm not discharging you.

... You're in the case. I'm not allowing any discharge. You're in the case. It's set for trial and today's the trial date and it's going to trial, so—

Let's get a jury."

---

**3.** There are only minor inconsistencies between the testimony of Officer Oleskiewicz and the testimony of Officer Stefan. The Officers disagree about which of them reached Kleba a

moment before the other. Their hypotheses about how Kleba received several minor injuries also differ.

Kleba waived his right to a jury trial, but the court proceeded to empanel a jury for advisory purposes only, explaining that the court would not be bound by the jury's verdict, but would consider the verdict in making its final determination. Kleba objected to the advisory jury, and the court reversed its earlier denial of a continuance and granted a continuance to research the legal question "as to whether I (the Court) can have a jury to be advisory to the Court where a defendant waives the right to have a jury trial." The court set a new trial date of December 3, 1980, and addressed Brody and Kleba:

> "THE COURT: ... Again I realize that the defendant expressed his desire to have Mr. Wexler here, but assuming Mr. Wexler isn't able to be here on December 2, [sic] maybe he is and maybe he is not, and you have stated already that you want Mr. Brody discharged, and of course I don't think at this point I'm going to allow a discharge because this case should and must go to trial. The witnesses have been down here a couple of times now. And I'm going to say, Mr. Brody, stay in the case. Be prepared. Be ready to go to trial.
>
> MR. BRODY: Very well, Judge.
>
> THE COURT: And unless this defendant has some other attorney from now until that time who can get prepared and be ready in the event Mr. Wexler cannot— it's your choice. You certainly can bring in any lawyer you want to try the case, but he's got from now, until that time to be prepared in case Mr. Wexler cannot be prepared.
>
> Do you understand that?
>
> DEFENDANT KLEBA: Yes."

On December 3, the trial court reviewed the procedural history of the case once again and asked Kleba, "Do you have any other lawyer available here to represent you besides Mr. Brody?" Kleba answered, "No." On this occasion (December 3), Kleba did not object to being represented by

attorney Brody, and Brody proceeded to trial without a request for a continuance and the court found Kleba guilty of all counts charged in the indictment. Kleba was sentenced to concurrent terms of fifteen years for attempted deviate sexual assault, fourteen years for attempted rape, twenty years for aggravated kidnapping, and fourteen years for robbery.[4]

Shortly after his trial and sentencing, Kleba's mother and wife located "Candy," the woman with whom he had allegedly spent time on the evening of August 2, 1979. She signed an affidavit stating that Kleba had left her apartment between 1:00 and 1:05 a.m. on August 3, 1979. The affidavit further alleged that she had moved out of the Chicago area soon after August 3, 1979 and returned in March of 1980. Kleba, now represented by other counsel, moved for a new trial on two grounds: (1) the ineffective assistance of his trial counsel and (2) the discovery of a new witness (Candy). The court denied the motion and Kleba appealed to the Illinois Court of Appeals. The Illinois Court of Appeals reversed the conviction on the offense of deviate sexual assault, but affirmed the remaining convictions. In February of 1983, the Illinois Supreme Court denied Kleba leave to appeal.

Kleba subsequently filed a petition for a writ of habeas corpus raising numerous issues in the United States District Court for the Northern District of Illinois. The parties filed cross-motions for summary judgment, and the district court granted the respondent Warden Kenneth McGinnis' motion and dismissed the petition. Kleba appealed. On appeal Kleba raises only two issues: (1) Whether he was denied his Sixth Amendment right to the counsel of his own choosing; and (2) Whether he was denied his Sixth Amendment right to the effective assistance of counsel.

## II

The Sixth Amendment right to counsel affords a defendant a "fair opportunity to

---

4. The unlawful restraint charge was merged with the attempt rape conviction as a lesser-included offense. *See People v. Kleba,* 110 Ill. App.3d 345, 66 Ill.Dec. 179, 181 n. 1, 442 N.E.2d 605, 607 n. 1 (1982).

secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). But the "exercise of that right must at times give way to the need for a fair and efficient administration of justice." *United States v. Cicale*, 691 F.2d 95, 106 (2d Cir.1982). *See also United States ex rel. Spurlark v. Wolff*, 683 F.2d 216, 220 (7th Cir.1982), *rev'd in part on other grounds*, 699 F.2d 354 (7th Cir.1983) (en banc). "[W]here the inability of retained counsel to serve gives promise of unreasonable delay or inconvenience in completing the trial, the court may require the defendant to secure other counsel." *Cicale*, 691 F.2d at 106 (*quoting United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir.1963)). Indeed, "[t]he Sixth Amendment does not give an accused the power to manipulate his choice of counsel to delay the orderly progress of his case." *Spurlark*, 683 F.2d at 220.

Kleba maintains that he was denied the right to be represented by counsel of his own choosing when the court refused to allow him to discharge attorney Brody. We fail to understand Kleba's assertion that "the trial court abused its discretion in refusing to grant another continuance and in forcing Kleba to trial with Brody as his counsel." Although trial courts have a responsibility to keep their calendars as current as possible, the court in the present case made every effort to accommodate its calendar to the schedule of Kleba's attorney Wexler, granting six continuances requested by the defendant between December 12, 1979 and October 27, 1980, with five of the six continuances due to Wexler's ill health. The court initially denied Kleba's motion for a continuance on October 27, 1980, but when Kleba raised objections to the presence of an advisory jury, the court subsequently granted a continuance until December 3, 1980. Thus, Kleba was not forced to go to trial on October 27 with Brody as his counsel. Instead the court specifically informed Kleba on October 27 "you certainly can bring any lawyer you want to try this case, but he's got from now until that time [December 3] to be prepared in case Mr. Wexler cannot be prepared." The court thus gave Kleba the option of retaining another lawyer if he so desired. Kleba was out on bail between October 27 and December 3 and could have attempted to obtain substitute counsel, but chose not to. The record fails to reveal an attempt by Kleba to retain new counsel, and on December 3, Kleba obviously agreed to representation by Brody and failed to object to Brody's representation of him. Brody failed to move for a further continuance, although he did inform the court of Wexler's continued ill health, stating, "I thought Mr. Wexler would be here. Mr. Wexler is ill."

█ In *Spurlark* the defendant requested numerous continuances to accommodate the schedule of his counsel. After nearly three years of continuances, the trial court gave the defendant a choice:

> "You can represent yourself in this case, or you can have a lawyer of your own choosing, or I am going to appoint [a lawyer] to represent you."

683 F.2d at 218. Since the attorneys the defendant desired to represent him were not available to proceed on the scheduled trial date, the court appointed an attorney to represent Spurlark. After his conviction, the defendant argued that instead of forcing him to trial with an attorney he did not want, the judge should have permitted him additional time to hire another attorney. In denying habeas corpus relief to Spurlark, we stated:

> "[The trial judge] gave the petitioner a choice of how the trial would proceed in a manner consistent with the orderly administration of justice. That the petitioner did not like this choice does not make it constitutionally offensive."

683 F.2d at 220. In the present case, the court also gave the petitioner a choice on October 27, 1980, of how the trial would proceed: either with Brody or with a new counsel if Wexler were not available for trial. Indeed, the trial court bent over backwards in an effort to accommodate Kleba and his attorneys, granting the defendant six continuances, and on the date

of trial, Kleba failed to object to his representations or request any further continuances. We agree with the district court's comment in denying the petition that, "[t]he petitioner must bear some responsibility for his own fate. His failure to secure substitute counsel of his own choice who would be prepared for trial if Mr. Wexler could not proceed on December 3, 1980 cannot now form the basis for the requested relief." *United States ex rel. Kleba v. McGinnis,* No. 83 C 4721 slip op. at 11 (November 29, 1984 N.D.Ill.).

### III

Kleba presents four different theories to support his contention that he received ineffective assistance of counsel from attorney Brody: (1) his counsel was unprepared and unwilling to represent Kleba; (2) his counsel failed to introduce photos of Kleba allegedly taken after his arrest on the morning of August 3, 1979; (3) his counsel engaged in unprofessional conduct during the trial and (4) his counsel failed to investigate the whereabouts of a potential witness (Candy).

The Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), set forth the standards for evaluating whether a defendant has been deprived of the effective assistance of counsel. The analysis involves two steps:

> "First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

466 U.S. at 687, 104 S.Ct. at 2064. In *United States v. Noble,* 754 F.2d 1324 (7th Cir.1985), we elaborated on the standards set forth in *Strickland:*

> "Under the first prong of the analysis, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness'.... This showing includes identifying 'the acts or omissions of counsel that are alleged not to have been the results of reasonable and professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professional competent assistance.' ... The second prong of the analysis requires that the defendant 'affirmatively prove prejudice.' ... This requires that 'there is a reasonable probability that but for counsel's unprofessional errors, the results of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ... In setting out this two-pronged analysis the *Strickland* Court noted that 'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.'"

*Id.* at 1355 (*quoting Strickland,* 104 S.Ct. at 2065–67). *See also United States v. Giangrosso,* 779 F.2d 376, 380 (7th Cir. 1985). With these standards in mind, we review the alleged shortcomings of Kleba's trial counsel Brody.

■ Kleba contends that Brody was "both unprepared and unwilling to represent Kleba." According to Kleba's brief, "He [Brody] was unprepared because he never contacted Kleba prior to trial. He only spoke to Kleba once, and that was already after the trial had begun." We initially note that at the summary judgment proceedings in the district court, Kleba failed to file any affidavits in support of his assertion that Brody had only spoken to Kleba "after the trial had begun." To the contrary, a review of the record reveals that Brody conferred with Kleba on at least two separate occasions prior to the commencement of his trial. At the October 27, 1980, hearing before the trial court,

attorney Brody represented to the court that "I only interviewed him [Kleba] once," thus revealing that Brody had conferred with Kleba sometime prior to October 27, 1980. At the hearing on Kleba's motion for a new trial on February 5, 1981, Kleba himself admitted that Brody interviewed him shortly after he entered the case as co-counsel and that he again conferred with Kleba in his office on "December the 3rd before we started this trial...." Further, Brody stated to the court on October 27, 1980 that he had been in communication with Mr. Wexler and that "Mr. Wexler did take care of all the discovery...." Brody, as co-counsel, presumably had access to all of Wexler's files, including research and discovery materials. Thus, Kleba has not demonstrated on the record that Brody's two meetings with Kleba combined with his access to Wexler's files and research were insufficient to adequately prepare Brody to defend Kleba at trial or that Brody's failure to meet more frequently with Kleba rendered Brody unprepared to defend Kleba at trial. Indeed, Brody reminded the court of "[t]he aggressive kind of trial that I gave him," and the state trial judge, stated at the hearing on the motion for a new trial that "[Mr. Brody] is a very capable criminal lawyer. He has been around these courts for many years, very able. ... [H]e has been around here long enough and he knows how to handle cases." Further the Illinois Appellate Court noted that "Brody put forth a solid, aggressive defense." 442 N.E.2d at 616. In addition, Kleba has failed to provide any case law authority supporting the proposition that Brody's failure to meet with Kleba more frequently before trial falls "below an objective standard of reasonableness." *Strickland*, 104 S.Ct. at 2065. We know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel; rather "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 104 S.Ct. at 2065. We are confident that an attorney as experienced

as Brody and referred to by the trial court as "a very capable criminal lawyer" can get more out of one interview with a client than a neophyte lawyer could get out of a similar meeting. Bearing in mind that counsel is "strongly presumed to have rendered adequate assistance," *id.* at 2066, we hold that Kleba failed to overcome this presumption that his counsel rendered effective assistance at his trial. Furthermore, even if we were to consider the failure to confer with Kleba more frequently prior to trial as deficient performance on the part of Brody, Kleba has also failed to "affirmatively prove prejudice" as a result of Brody's failure to meet more frequently with Kleba prior to trial. *Id.* at 2067. According to *Strickland*, "Even if a defendant shows that particular errors of counsel were unreasonable, ... the defendant must show that they actually had an adverse effect on the defense." *Id.* at 2067. Kleba has provided no evidence nor has our review of the record uncovered any evidence that Kleba's defense was adversely affected by Brody's failure to meet more frequently with Kleba prior to trial. From our review of the record we are convinced that the trial court accurately appraised Brody's abilities in stating that Brody is "a very capable criminal lawyer" who "knows how to handle cases," and the Illinois Appellate Court confirmed that assessment concluding that Brody provided "a solid aggressive defense."

■ Whether Brody was willing or unwilling to represent Kleba because of Kleba's remarks expressing his desire to discharge Brody is immaterial when determining whether or not his performance was proper or deficient, since the focus of *Strickland* is on the *performance* of counsel rather than his state of mind. *See, e.g., Strickland*, 104 S.Ct. at 2065 (discussing "proper measure of attorney *performance*," "judicial evaluation of attorney *performance*," and "fair assessment of attorney *performance*.") Kleba has failed to present any case law for the proposition that what he interprets as the unwillingness of counsel to represent a client consti-

tutes "deficient performance" within the meaning of *Strickland,* nor has Kleba provided any evidence suggesting that Brody's alleged unwillingness to represent Kleba due to Kleba's remarks in any manner affected the quality of Brody's performance as counsel. We hold that an allegation that an attorney was unwilling to serve as defense counsel is insufficient to overcome the presumption that counsel has "rendered adequate assistance." *Id.* at 2066.

■ Kleba also argues that Brody's representation was deficient in failing to introduce photographs depicting "the extent of the wounds Kleba received" at the time of his arrest. Kleba asserts that introducing the photographs would have undermined the credibility of the arresting officers, who, according to Kleba, inflicted the wounds on Kleba during a beating at the time of the arrest. We fail to see how the photos in question are relevant to the question of Kleba's guilt or innocence, although they may be of value if a civil action were pending seeking damages for alleged police brutality. Further, there is no dispute that Kleba received injuries at the time of his arrest, and the injuries suffered by Kleba were consistent with the arresting officers' testimony that Kleba ran into a locked gate prior to his arrest while attempting to avoid apprehension. While the defendant disputed the arresting officers' version of how the injuries occurred, we fail to understand how the photographs could have been helpful to clarify how Kleba sustained the injuries as they only showed the resulting wounds and were not "action photos" of either his fall or his alleged struggle with the officers. Accordingly, Brody could reasonably conclude that the photographs would have had little if any probative value concerning the origin of Kleba's

injuries (providing at most cumulative evidence of the nature and extent of his injuries, rather than the origin). Viewed in the context of the entire trial, we hold that the decision of the trial attorney not to introduce the photos constituted a proper and reasonable trial tactic that does not fall below an "objective standard of reasonableness." "The Supreme Court's decision in *Strickland* made the law eminently clear that the judgments of trial counsel involving strategic decisions will not be considered as a proper basis for bringing a Sixth Amendment ineffective assistance of counsel claim." *Giangrosso,* 779 F.2d at 380.

■ We turn to Kleba's claim that Brody displayed unprofessional conduct during trial. He specifically asserts that Brody's "demeanor towards the court and the witnesses from the start to finish of the trial was arrogant and insulting towards the court, the prosecutors, and witnesses." As examples, Kleba cites the fact that Brody was three hours and twenty minutes late to trial on the first day and also quotes numerous exchanges between Brody, and witnesses and/or the prosecuting attorneys.[5] The record fails to demonstrate that Brody's conduct at trial was "outside the wide range of professionally competent assistance." In addition Brody promptly apologized to the court for his tardiness (purportedly caused by his involvement in a federal criminal matter), and although the court admonished him for his tardiness and sustained objections to certain of Brody's questions, we agree with the conclusion of the Federal district court that "the [state] trial judge did not appear to hold Brody's conduct against the petitioner." Slip op. at 18. The record reveals that the trial court

---

5. For example:

"MR. BRODY: When you talked to the State's Attorney though, he asked you certain questions and you made answers to those questions, is that right?
WITNESS: Yes, sir.
MR. BRODY: And did he suggest to you how to answer certain questions, didn't he?
WITNESS: No, sir.
MR. BRODY: Not at all.

WITNESS: No, sir.
MR. BRODY: Do you go to church on Sunday?
THE COURT: Sustained.
MR. BRODY: Do you sleep well at night?
PROSECUTING ATTORNEY: Objection.
THE COURT: Sustained.
PROSECUTING ATTORNEY: This is really contemptuous if he is going to continue this."

conducted the proceedings fairly and impartially. Thus, even if we were to find Brody's "demeanor towards the court and the witnesses" to constitute deficient performance of counsel, we conclude that the record fails to support Kleba's allegation that he was prejudiced by Brody's "demeanor" during trial.

Finally we turn to Brody's alleged failure to investigate the whereabouts of a potential witness—Candy. According to Kleba, if Brody had located Candy prior to trial, her testimony would have corroborated Kleba's testimony and bolstered his credibility. Noting that the assault began at 12:45 a.m. and that Candy's affidavit recited that Kleba was with her until 1:00 or 1:05 a.m., Kleba asserts that Candy would have testified that he was with her when the assault began.

In reviewing Kleba's contention that failing to investigate the whereabouts of Candy constituted ineffective assistance of counsel, we initially determine whether Kleba has affirmatively proved prejudice from the failure of Candy to testify at trial. Prejudice is affirmatively proved when " 'there is a reasonable probability that but for counsel's unprofessional errors, the results of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Noble*, 754 F.2d at 1355 (*quoting Strickland*, 104 S.Ct. at 2067).

Initially we note that the Illinois Appellate Court reviewed Candy's affidavit to determine whether her allegations provided grounds for a new trial on the basis of newly discovered evidence. Under the standard applied by the Illinois Court of Appeals, to merit a new trial "the new evidence must be of such conclusive character that it will probably change the results on retrial." 66 Ill.Dec. at 189, 442 N.E.2d at 615. In affirming the trial court's denial of the motion for a new trial, the Illinois Court of Appeals stated:

"Even if we interpreted [Candy's proposed testimony] as showing facts, however, the testimony would not have had sufficient probative force or weight to produce a verdict of not guilty. For example, had defendant left Candy's apartment just ten minutes earlier, he would have had ample time to have committed the crime for which he was convicted. Further, Candy did not see the actual apprehension of defendant, nor did she see the alleged fleeing assailant. Thus, she could have done no more than to testify that she spent several hours with the defendant, a fact which is not in issue."

*Id.* 66 Ill.Dec. at 189, 442 N.E.2d at 615. Citing this passage from the Illinois Court of Appeals' opinion, the district court reasoned, "we doubt that Candy's testimony would have affected the results of Kleba's trial." (Slip op. at 17).

Our review of the record reveals that the victim, Jane Doe, testified that the assailant was a Caucasian male, and that he had liquor on his breath. Kleba, by his own admission drank at least one beer on the evening of August 2, 1979. Doe also stated that her assailant removed her watch and placed it in his pocket. Investigator Oleskiewicz testified that he observed a Caucasian male choking a female and took up pursuit of the assailant, reciting that his chase of the assailant covered approximately seventy-five yards and lasted no more than one minute. He testified without contradiction that he never lost sight of the assailant from the time he first shined his spotlight on the assailant until he apprehended him with the assistance of other officers. According to Investigator Oleskiewicz, he arrested the assailant, later identified as Kleba, and discovered what was later identified as Doe's watch in Kleba's pocket. Officer Stefan observed Oleskiewicz chase a Caucasian male, later identified as Kleba, across the alley and subsequently assisted Oleskiewicz in apprehending Kleba and placing him under arrest. Stefan confirmed that Oleskiewicz found Doe's watch in Kleba's pocket. The testimony of Doe, Officers Oleskiewicz and Stefan, together

with the watch in Kleba's pocket, provides overwhelming evidence of Kleba's guilt.[6]

In reviewing Candy's affidavit, we note that her allegations do not provide any evidence contradicting either Oleskiewicz' or Stefan's testimony regarding the pursuit of the assailant and the discovery of Doe's watch in Kleba's pocket. The affidavit merely asserts that Kleba was at her apartment until approximately 1:00 a.m. As the Illinois court noted, if Kleba left her apartment ten minutes earlier than alleged in the affidavit, he would have had ample time to commit the crimes for which he was convicted. She does not allege that she saw what happened to Kleba after he left her apartment and thus her testimony could not corroborate Kleba's self-serving testimony of being almost run down by the "real" assailant and subsequently being beaten and framed by the police. Thus, from the content of Candy's affidavit, we conclude that her testimony does not undermine our confidence in the outcome of the state trial. Since Kleba has failed to affirmatively prove that the failure to investigate/locate Candy as a witness prejudiced his defense, he has not satisfied the second prong of the *Strickland* analysis.[7]

In addition, we do not believe Kleba's failure to investigate Candy's whereabouts constituted deficient performance on Brody's part as the record reveals that Kleba was the one primarily responsible for Brody's failure to locate Candy as a witness. Brody entered the case in June of 1980 to assist Attorney Wexler, and on October 27, 1980 the trial judge told Kleba to be prepared to go to trial in December with Brody or a new lawyer representing him (Wexler was unavailable due to illness), but Kleba never advised Brody about Candy or her value as a witness until the morning of his trial as Brody stated to the court, "I knew nothing about this particular witness.... I was never informed of her name." (R. 29). Since the trial court told Kleba that he should be prepared to go to trial with Brody, it was Kleba's obligation to make certain that Brody was made aware of all the potential witnesses' and their names and addresses. For example, in *United States v. Zylstra,* 713 F.2d 1332 (7th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983), this court held that a defendant failed to prove his claim of ineffective assistance of counsel:

> "During trial the defendant complained to the court that his attorney had refused to interview most of the potential witnesses he provided. The attorney answered the accusation and pointed out to the trial court that the defendant was unable to supply the last names or addresses of many of the proposed witnesses and that based on the information given him by the defendant about their testimony they would not aid the defense. Although counsel should make reasonable investigation into all defenses, *United States v. Hearst,* 466 F.Supp.

---

**6.** Doe never had the opportunity to see her assailant during the course of the assault. Since she never observed her assailant's face, her inability to identify him does not undermine the other evidence identifying Kleba as the assailant.

**7.** The dissent speculates that "[i]f Candy testified before the jury and were believed, the jury would presumably have acquitted Kleba." But prejudice is not sufficiently demonstrated unless Kleba establishes a reasonable probability that Candy's testimony would have changed the jury's verdict. The evidence of Kleba's guilt is overwhelming. Kleba was apprehended and arrested by Officer Oleskiewicz following a chase of but one minute in duration, and seventy-five yards in length. During the foot race the defendant Kleba was under continual observation by Officer Oleskiewicz from the time he was initially observed choking Jane Doe standing against a fence near an alley up until the time of his apprehension and arrest. The path of defendant Kleba's attempted escape route was illuminated not only by the two squad cars but as well from overhead streetlight illumination. Finally, Kleba, as a Caucasian male with liquor on his breath, matched the description that Doe gave of her assailant. The dissent's conjectures concerning Candy's credibility as a witness fail to tip the scales in view of the overwhelming evidence of Kleba's guilt. Because the evidence of Kleba's guilt is overwhelming, he has failed to establish a reasonable probability that Candy's testimony would have changed the jury's verdict.

1068 (N.D.Cal.1978), *aff'd in part vacated in part,* 638 F.2d 1190 (9th Cir.1980), *cert. denied,* 451 U.S. 938 [101 S.Ct. 2018, 68 L.Ed.2d 325 (1981) ] an attorney is not expected to be infallible. 'For judges to second-guess reasonable professional judgment and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy—....' *Jones v. Barnes* [103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ],

\* \* \* \* \* \*

Hindsight frequently provides a wiser course, but '[i]n reviewing an attorney's performance we are not free to second-guess his legitimate tactical decisions.' [*United States v. Weston,*] 708 F.2d 302, 306 (7th Cir.1983)."

*Id.* at 1338–39. In the present case, when asked at trial on cross-examination the name of the girl he was with on the night of the crime, Kleba answered, "She said they call her Candy." (R. 328) The only testimony he gave concerning the location of the apartment where he visited with Candy was described as follows: "I am not positive of the address of the apartment. I know it is on the 1100 block of Wellington. There are 6 or 9 apartments there so there is more than one number on the door." (R. 326) He later added that the apartment was located on the "Southwest corner [of Wellington and some other street.]" (R. 327) The following colloquy also occurred during the state's cross-examination of Kleba at trial:

"Q. Did she [Candy] tell you whose apartment that was?

A. Her girlfriends.

Q. Did you see or meet that girlfriend?

A. No, I did not.

\* \* \* \* \* \*

Q. Do you know the name of the person who leased the apartment?

A. No I do not."

(R. 331–32). Kleba failed to inform his counsel of "Candy" until the day of his trial and the record fails to disclose wheth-er prior to trial Kleba ever provided Brody with a description of Candy or even stated her approximate age. Further, as in *Zylstra,* the defendant was unable to provide his attorney with the proper full name or address of "Candy"—a potential witness. Thus, Kleba rather than Brody was responsible for Candy not being located prior to trial, and we refuse to use hindsight to "second guess [Brody's] legitimate tactical decision[ ]" not to search for a potential witness that his client never informed him of prior to trial—a witness whose true name and address were not known even by the defendant Kleba. We conclude that Brody's failure to investigate the whereabouts of "Candy" neither prejudiced Kleba's defense nor constituted deficient performance of Brody as defense counsel.

■ Finally, Kleba contends that even if the separate acts and omissions of Brody may not have amounted to ineffective assistance of counsel, their cumulative effect was substantial and prejudicial enough to meet the *Strickland* test. Kleba correctly cites *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985), for the proposition that the cumulative effect of individual acts or omissions of counsel "may be substantial enough to meet the *Strickland* test." We have reviewed the record and we conclude that Kleba has failed to establish that Brody's conduct "so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Crisp,* 743 F.2d at 583 (*quoting Strickland,* 104 S.Ct. at 2064).

### IV

The judgment of the district court is AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's thorough and well-reasoned discussion of the choice-of-counsel issue. Except as to one aspect, I also agree with the discussion of ineffective assistance of counsel. I do not believe,

however, that summary judgment should have been granted on the claim that Kleba was denied effective assistance because his counsel failed to investigate the whereabouts of Candy. I would remand the case to the district court for further proceedings solely on that claim. The majority's description of the facts is generally accurate,[1] but some of the pertinent facts are omitted. These omitted facts are included in the discussion below.

## I

It is uncontradicted that the attack on Doe began at 12:45 a.m. Thus, Candy's statement that Kleba was with her until *at least* 1:00 a.m., if accurate, would provide a complete alibi to the crime. If she had testified before the jury and been believed,[2] the jury would presumably have acquitted Kleba. A complete alibi should ordinarily meet the prejudice requirement of *Strickland.* But if the evidence against a defendant is "overwhelming," a deficient performance of counsel that would otherwise be deemed prejudicial might fail to produce a reasonable probability of prejudice. *See Strickland v. Washington,* 466 U.S. 668, 700, 104 S.Ct. 2052, 2071, 80 L.Ed.2d 674 (1984); *Keys v. Duckworth,* 761 F.2d 390, 394 (7th Cir.1985) (per curiam). Since Kleba's story of a police frameup and beating is implausible, evidence against him that was overwhelming on other accounts would probably preclude a finding of a reasonable probability of prejudice. After considering all the circumstances of the case, I do not believe that the evidence against Kleba was overwhelming.

Neither Doe nor her neighbor could identify Kleba as the assailant. The police officers never saw the assailant's face prior to capturing Kleba. It is difficult to take literally the officer's testimony that he never lost sight of the man he was pursuing through the night. The gangways, alley and yards through which the officer ran were dark; he had to make at least two turns; and he was climbing fences. The chase, after all, took place in the dead of night. Further, the testimony and written reports of the three officers involved in the chase are inconsistent with respect to which officer or officers caught Kleba and how he was injured. Moreover, one officer testified that Doe's face was bloody and that the assailant's white shirt had blood on it when the police first arrived. At the police station, the police took custody of Kleba's shirt, but no evidence was presented at trial indicating whether Doe's blood was found on Kleba's shirt, and the prosecution failed to produce the shirt at trial.[3] In light of these facts, I do not regard the evidence against Kleba as overwhelming, even with the police testimony regarding Doe's watch in Kleba's pocket.[4]

As noted, if Kleba were with Candy until 1 a.m., he would have a complete alibi; it would not be relevant that she did not see what happened to him. Further, it is entirely conjectural that Candy is mistaken about the time Kleba left her. In addition, Kleba was the only defense witness (other than an adverse witness—Officer Streff). Kleba's self-serving testimony would likely

1. A minor inaccuracy is that Doe did not testify that her assailant picked up the watch and placed it in his pocket. On questioning by the trial judge, she testified that she saw him pick it up, but did not see what he did with it. (R. 182).

2. At this stage of the litigation, there is no particular reason to question Candy's credibility. She apparently had a one night affair with the defendant, but there is no indication that they maintained any relationship thereafter. Further, she has never been cross-examined.

3. At trial Kleba testified that he had not owned a white shirt.

4. The watch could have been left at the site of the attack. Also a police report indicated the assailant threw down a calculator as he was chased; he could also have thrown down the watch. I certainly do not conclude that there was police misconduct. But there are inconsistencies in the evidence that prevent it from being overwhelming. I also note that considering the weight of the evidence to determine the prejudicial effect of Candy's nonappearance is not inconsistent with 28 U.S.C. § 2254(d). *See Strickland,* 466 U.S. at 695–96, 698, 104 S.Ct. at 2068–69, 2070.

be viewed in a different light if corroborated by that of another witness, who appears to have no reason to be biased in favor of Kleba. For these reasons one's confidence in the outcome of the trial is undermined by Candy's nonappearance at trial. And the prejudice standard is thereby satisfied. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

## II

I also believe that there is a genuine issue of material fact whether Brody's performance was deficient. The summary judgment motion was decided on the basis of the state court record which included various motions of the parties, the trial transcript, the transcripts of pretrial hearings and the transcript of a hearing on defendant's motion for a new trial. Neither party provided any new affidavits to support or oppose the summary judgment motion. Despite defendant's request, neither Candy nor Kleba was permitted to testify at the post-trial hearing in the state court. Neither did the attorneys Brody or Wexler testify at that hearing. Kleba's counsel, however, was permitted to put an offer of proof into the record. Both Brody and Kleba made comments at the hearing, but the comments were not under oath, they were not developed by counsel for either side and they were not all made in a context pertinent to the present issue.

At the state post-trial hearing, there was a discussion about whether Brody was entitled to the proceeds of Kleba's bond. Kleba said that, after Wexler first introduced him to Brody (at a time when Wexler still intended to work on the case), "[t]he next time I ever talked to Mr. Brody anywhere outside or in the courtroom—I never talked to him in the courtroom or outside the courtroom—was December the 3rd before we started this trial up in his office. And there is the time when I told him about what was pending in this case. I asked him to enter the pictures. He didn't want to do nothing. He didn't want to find out anything about the witnesses." (R. 59–60). Further, in Kleba's offer of proof following

the denial of permission to testify at the post-trial hearing, Kleba's new counsel stated that the following could be proved: (1) that Wexler was fully advised about Candy and had promised to try to locate her, by hiring investigators if necessary; (2) that until at least October, the defendant thought that Brody would only participate by assisting Wexler; (3) that subsequent to that time Kleba never met with Brody until the day of the trial; and (4) that, when they met that day, Kleba told Brody about Candy, but it was too late to locate her. (R. 19–21).

Contrary to the implications of the majority opinion, defense counsel has a duty independent of the efforts of the defendant to reasonably investigate all defenses. *Crisp v. Duckworth*, 743 F.2d 580, 583 & n. 2 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985); *Arrowood v. Clusen*, 732 F.2d 1364, 1370 (7th Cir.1984); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir.1985); *Bell v. Watkins*, 692 F.2d 999, 1009 (5th Cir.1982), *cert. denied,* 464 U.S. 843, 104 S.Ct. 142, 78 L.Ed.2d 134 (1983). That investigation need not be unlimited in scope or unerring in execution, but it must be reasonable. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066–67; *United States v. Zylstra*, 713 F.2d 1332, 1338–39 (7th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983); *Rogers v. Israel*, 746 F.2d 1288, 1294 (7th Cir.1984). Further, the adequacy of information provided by the defendant often determines the reasonableness of defense counsel's investigation. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir.1975); *United States v. Decoster*, 624 F.2d 196, 209 (D.C.Cir.1976) (en banc) (plurality opinion). A defendant's failure to cooperate with his attorney, though not fully negating the duty to investigate, limits the scope of investigation that is necessary in order to meet the reasonableness standard. *Thomas v. Wainwright*, 767 F.2d 738, 743 (11th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986); *Bell v. Watkins*, 692 F.2d at 1009 & n. 11; *Gray v. Lucas*, 677 F.2d 1086, 1093–94 (5th Cir.

1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983). But, "[t]hough there may be unusual cases when an attorney can make a rational decision that investigation is not necessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation." *Crisp,* 743 F.2d at 583.

Thus, in assessing an investigation, if certain evidence or witnesses could not reasonably have been discovered without the defendant's cooperation and the defendant did not cooperate, defense counsel's failure to find the evidence cannot be ineffective assistance. *Thomas v. Wainwright,* 767 F.2d at 744; *United States v. Golub,* 694 F.2d 207, 214 (10th Cir.1982). In particular, if defense counsel fails to search for and find potential witnesses when he has not been provided with their last names or addresses and the potential value of their testimony is questionable, he has not acted unreasonably. *See Zylstra,* 713 F.2d at 1338–39; *Decoster,* 624 F.2d at 211. But defense counsel cannot simply rely on the defendant or his family to conduct the entire investigation. *Crisp,* 743 F.2d at 583 n. 2.

The majority cites *Zylstra* to support its argument that Brody did not fall below standard by failing to search for Candy. But *Zylstra* involved a number of potential witnesses and evidence that would not have aided Zylstra's defense. Further, *Zylstra* was an infinitely more complex case than the one before us and counsel there apparently adequately investigated other defenses that had a stronger chance of success than the one in controversy. Brody, however, had only one witness to investigate and that witness could testify to a complete alibi. Most importantly, the alibi defense is the only string to Kleba's bow. *See United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658, n. 3 (7th Cir.1984) (failure to investigate defendant's only defense is less

likely to be reasonable than failure to investigate one of a number of defenses), *overruled in part on other grounds, United States v. Payne,* 741 F.2d 887, 891 n. 4 (7th Cir.1984); *Keys v. Duckworth,* 761 F.2d at 392 (same). Kleba's testimony at trial shows that he could provide Brody with the location of a building to search and with an unusual first name. Nothing in the record indicates that Brody sought to investigate any defense nor that he bothered to question his client before the day of the trial. Nothing suggests that Kleba failed to cooperate. Moreover, Kleba offered to prove that he gave all the available information about Candy to Wexler and the majority presumes that Brody had access to Wexler's file. Based on the record before us, there is certainly an issue of fact whether Brody conducted a reasonable investigation.[5] Hence summary judgment should not have been granted.

Even if Brody's statement at the post-trial hearing should constitute some evidence of Kleba's noncooperation, we need not presume that the state court finding of noncooperation is correct. Brody did not make the statement under oath and was not cross-examined. Kleba was not permitted to testify and Wexler was not available to testify. Counsel made an offer to prove facts that would support Kleba's argument that Brody or Wexler, not Kleba, was at fault. State findings resulting from such a hearing need not be adopted since Kleba did not receive a full and fair hearing at which to fully develop the facts. *See* 28 U.S.C. § 2254(d)(2), (3), (6). Since the facts were not adequately developed in the state court, I would remand the case for an evidentiary hearing in the district court at which Kleba might have an opportunity to prove his allegations. *See Rogers v. Israel,* 746 F.2d at 1295.

### III

The record is therefore inadequate to support the majority's conclusion that

---

5. Nothing suggests that Kleba gave information to Brody or Wexler from which they could conclude that the alibi defense was inadequate and that therefore further investigation was unnecessary. *See Matthews,* 518 F.2d at 1246.

Neither is there anything to suggest a strategic or tactical choice to which we should defer on review. *See Cosey v. Wolff,* 727 F.2d at 658 n. 3; *Rogers v. Israel,* 746 F.2d at 1294.

counsel's performance was not deficient. Whether the deficiency was sufficiently prejudicial is a closer question, but I believe there is enough to show prejudice. I would remand the case to the district court for an evidentiary hearing on the claim in question. I, therefore, respectfully dissent to the extent indicated.